WRC PROPERTIES, INC., demandante y recurrida, *v.* HERIBER-
TO SANTANA y la SOCIEDAD DE GANANCIALES compuesta
por éste y su esposa ELISA CRUZ, demandados y recurren-
tes; INSTITUTO DE MODELAJE JALUSAN, INC., tercera de-
mandada y tercera demandante.

*Número:* R-84-514      *Resuelto:* 26 de febrero de 1985

128

*Juan F. Esteves, Juan A. Sánchez Rivoleda, R. Nilda Ponce Cancel,* abogados de los recurrentes; *Enrique Figueroa Llinas,* y *Bobonis,* de *Bobonis & Rodríguez Poventud,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

El primero de diciembre de 1982 W.R.C. Properties, Inc. (WRC) arrendó al Instituto de Modelaje Jalusan, Inc., el local 2-C del Centro Comercial International Plaza. Comenzaría el 1ro de febrero de 1983 hasta el 31 de enero de 1988 para un total de cinco (5) años. Se estipularon los cánones mensuales de renta mínima anual, respectivamente en $29,007.04; $31,075.04; $33,143.04; $35,211.04; y $37,279.04. El Instituto asumió también el pago de los gastos de mantenimiento ascendentes a $100 la mensualidad. Además se pactó que en caso de que el Instituto abandonase el local voluntaria o involuntariamente, WRC podría reclamarle el pago de la totalidad de los cánones y otras partidas exigibles por el resto del término del contrato.

En la misma fecha en que fue suscrito este contrato, Heri-

berto Santana —atribuyéndose por sí solo la representación de la sociedad de gananciales constituida por él y Elisa Cruz— otorgó una fianza a favor de WRC para garantizar solidariamente las obligaciones contraídas por Jalusan. Santana firmó el documento en dos espacios. Uno en su carácter personal, y el otro como representante de la sociedad conyugal Santana Cruz. El espacio provisto en el contrato para la firma de su esposa quedó en blanco.

Los términos de esa garantía traducidos al vernáculo son los siguientes:

*GARANTIA*

POR VALOR RECIBIDO, y como incentivo ("inducement") para WRC PROPERTIES, INC., como Arrendador, para celebrar el contrato conmutativo de arrendamiento de fecha 1ro. de diciembre de 1982 con relación a cierto establecimiento conocido como Southwest Corner ("Esquina Suroeste") segundo piso, Ala "C" en el International Plaza Shopping Center, localizado en Isla Verde, Carolina, Puerto Rico, con el INSTITUTO DE MODELAJE JALUSAN, INC., como Arrendatario, los suscribientes *incondicionalmente garantizan el cumplimiento cabal y la observancia de todos los convenios, condiciones y acuerdos allí establecidos a ser cumplidos y observados por el Arrendatario,* sus sucesores o cesionarios, y expresamente se comprometen a que la validez de este acuerdo y las obligaciones del garantizador del mismo de ninguna manera se terminarán, afectarán o perjudicarán por razón de cualquier prórroga que el Arrendador le conceda al Arrendatario, *o por razón de reclamación de parte del Arrendador contra el Arrendatario de cualquiera de los derechos o remedios reservados al Arrendador bajo las disposiciones* del mencionado contrato de arrendamiento o por relevarse el Arrendatario de cualquiera de sus obligaciones bajo dicho contrato por aplicación de ley o por cualquier otro motivo (incluso, pero sin limitarse a, el repudio de dicho arrendamiento en relación con procedimientos bajo las leyes de quiebra que se aprueben ahora o en el futuro); *los suscribientes por la presente* renuncian a todas las defensas de

garantía "suretyship".) [(¹)] Los suscribientes además convienen y acuerdan que esta garantía continuará en toda su fuerza y vigor en cuanto a cualquier renovación, modificación o prórroga de dicho arrendamiento, hayan o no recibido los suscribientes cualquier notificación o dado su consentimiento para tal renovación, modificación, o prórroga. *Los suscribientes también acuerdan que su responsabilidad bajo esta garantía* será directa, y que en cualquier acción a la que el Arrendador tenga derecho bajo dicho arrendamiento, el Arrendador podrá, a su elección, *proceder mancomunada o solidariamente contra los suscribientes y el Arrendatario, y podrá proceder contra los suscribientes sin haber comenzado ninguna acción contra el Arrendatario* o haber obtenido sentencia contra éste. (Énfasis y traducción nuestros.) *Exhibit* I, pág. 59.

El 16 de junio de 1983 WRC instó acción de desahucio en el Tribunal Superior, Sala de Carolina, (Civil Núm. 83-1492 (E)) por incumplimiento contractual de Jalusan, consistente en no haber satisfecho las mensualidades de mayo y junio de 1983. Jalusan no compareció y en rebeldía dicho foro decretó el desalojo e impuso $500 de honorarios de abogado. La sentencia fue debidamente ejecutada.

El 2 de septiembre de 1983 WRC demandó a Heriberto Santana y la sociedad legal de gananciales compuesta por él y su esposa Elisa Cruz para reclamarles el cobro de varias parti-

---

(¹) Sobre el particular, un reputado comentarista español, en términos de una visión de Derecho comparado, ha expresado que:

"Conviene mencionar que, en Derecho angloamericano, con la palabra *suretyship* se indica el vínculo personal que contrae quien se obliga a pagar al acreedor de la misma manera que si la deuda fuera del propio *surety*. Los derechos del acreedor contra el principal deudor y contra el obligado en garantía de la misma deuda son idénticos. En cambio, con la palabra *guaranty* se indica el vínculo que contrae quien se obliga a pagar la deuda del principal obligado, si éste no lo hace. Las obligaciones del *surety* son las que resultan del mismo contrato entre acreedor y deudor principal; las del *guarantor* son las que resultan del contrato que él mismo ha celebrado como obligado con carácter secundario." J. Puig Brutau, *Fundamentos de Derecho civil, contratos en particular*, 2da ed. rev., Barcelona, Ed. Bosch, 1982, T. 2, Vol. 2, pág. 619 n. 42.

das como fiadores solidarios. Los esposos Santana Cruz presentaron demanda de tercero contra Jalusan. Ésta reconvino contra WRC en reclamación de daños por alegado incumplimiento de contrato.

Oportunamente WRC solicitó y obtuvo sentencia sumaria del Tribunal Superior, Sala de San Juan, que le adjudicó la responsabilidad absoluta a la sociedad Santana Cruz con arreglo a las cláusulas del contrato. Se les condenó a pagar $162,455.34 que se desglosan así: "a) $158,572.59 por concepto de renta mínima garantizada durante el término del contrato. A dicha suma hay que restarle la cantidad de $2,417.25 dada en calidad de depósito por Jalusan, para un total neto de $156,155.34; b) $5,800.00 por concepto de cuotas de mantenimiento, y (c) $500.00 por concepto de honorarios de abogado." Además les impuso intereses legales a partir de la sentencia, costas y $3,500 adicionales para honorarios de abogado.

Inconformes los esposos Santana Cruz solicitaron revisión. WRC formuló oposición. Resolvemos al amparo de la Regla 50 de nuestro Reglamento.

## II

Los planteamientos de los recurrentes son: (a) que no procedía la sentencia sumaria que adjudicó su responsabilidad sin previamente pasarse juicio sobre la reconvención de tercero, lo cual esclarecería el grado, si alguno, de su responsabilidad; (b) que la imposición de responsabilidad a la sociedad Santana Cruz es contraria a derecho, y (c) que WRC no les ofreció ninguna oportunidad de cumplir con la obligación antes de dar por terminado el contrato, y esa actuación puso en movimiento la aplicación sistemática de una cláusula penal, a juicio de ellos injusta, opresiva y desproporcionada que justifica un remedio en equidad "para frenar el predominio absoluto de la voluntad a una más justa proporción al grado de culpa y la dimensión del perjuicio ocasionado".

El tribunal de instancia optó por dar curso a la sentencia sumaria, a base de estimar que procedía como cuestión de derecho. En lo que respecta a la cuestión procesal —en ausencia de controversia real de hechos que impidan usar ese mecanismo— habremos de respetar esa decisión con miras a evaluar los méritos sobre la responsabilidad de los recurrentes.

## III

Una vez más debemos fijar los límites de las obligaciones de una sociedad legal de gananciales por actos unilaterales de uno de sus miembros. Nuestras decisiones recientes en *Pauneto v. Núñez*, 115 D.P.R. 591 (1984) y *Banco de Ahorro del Oeste v. Santos*, 112 D.P.R. 70 (1982), constituyen sólidos precedentes para la resolución de conflictos de esta naturaleza.

La complejidad del asunto, según manifestada en esos casos, dimana del Art. 1308 del Código Civil, ([2]) dispositivo de que serán de cargo de la sociedad de gananciales "[t]odas las deudas y obligaciones contraídas durante el matrimonio por cualquiera de los cónyuges". 31 L.P.R.A. sec. 3661. Dicha redacción, del 1976, intentó equiparar la posición y participación de la mujer en la sociedad legal de gananciales. Sin embargo, el citado Art. 1308 no satisfizo el ideal de igualdad que como intención clara animó a la Asamblea Legislativa. Su redacción, formulada sobre el anterior precepto cuyo texto contemplaba que "[t]odas las deudas y obligaciones contraídas durante el matrimonio por el marido" "[s]erán de cargo de la sociedad [legal] de gananciales", contribuyó a perpetuar un lenguaje desorientador del remedio legislativo perseguido de superar el anacronismo histórico existente, producto de una

---

([2]) En España, el hoy Art. 1367 equivalente evolucionó en forma consistente con la igualdad de los cónyuges promulgada. Reza: "Los bienes gananciales responderán en todo caso de las obligaciones contraídas por los dos cónyuges conjuntamente o por uno de ellos con el consentimiento expreso del otro." J. L. de los Mozos, *Comentarios al Código civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1984, T. XVIII, Vol. 2, pág. 299.

época en que sólo se reconocían facultades de administración y representación al marido. Bajo esa visión, era lógico *presumir* que todas las deudas y obligaciones, vigente el matrimonio, se atribuyeran a la sociedad, en función a la "incapacidad" de la mujer como sujeto de derecho para contratar a nombre de esa entidad. Ello explica la técnica adjudicativa anterior basada en la distinción, más aparente que real, entre actos de disposición y obligación. El primero requería el consentimiento de ambos cónyuges, el segundo no, porque sólo había un sujeto capaz: el marido. De manera que, la capacidad de "obligar" a la sociedad por la conducta individual de un solo cónyuge tenía como basamento peculiar la desigualdad de las partes que integraban la entidad conyugal. Cuando el legislador puertorriqueño en el 1976 reformuló el lenguaje del Art. 1308 a la conducta individual de cualesquiera de los cónyuges suscitó un vacío estatutario que generó varias interrogantes: ¿Podría un cónyuge contratar a nombre del otro que poseía iguales capacidades de administración y representación? ¿Eran distinguibles los actos de obligación del Art. 1308 de los del 1313? ([3]) ¿Correspondía esa dicotomía a una distinción entre derecho de carácter crediticio que no requería el concurso de ambos cónyuges, *vis-à-vis* una obligación de carácter real cuando se sujetaban bienes muebles o inmuebles en garantía que presuponían una actuación conjunta?

---

([3]) Disponen, en parte:

"Serán de cargo de la sociedad de gananciales:

"1. Todas las *deudas y obligaciones* contraídas durante el matrimonio por cualquiera de los cónyuges. . . ." (Énfasis nuestro.) 31 L.P.R.A. sec. 3661.

. . . . . . . . .

"No obstante lo dispuesto en la sec. 284 de este título, ninguno de los dos podrá donar, enajenar, *ni obligar a título oneroso*, los bienes muebles e inmuebles de la sociedad de gananciales, sin el consentimiento escrito del otro cónyuge, excepto las cosas destinadas al uso de la familia o personales de acuerdo con la posición social o económica de ambos cónyuges." (Énfasis nuestro.) 31 L.P.R.A. sec. 3672.

Un examen cuidadoso de los referidos artículos refleja que ambos incluyen actos de obligación. El Art. 1308 trata sobre una obligación genérica de contenido patrimonial que confiere un derecho de crédito al acreedor contra el patrimonio del deudor, ejecutable por la vía forzosa en caso de incumplimiento. Como tal, el obligado responde con todos sus bienes presentes y futuros a tenor con el Art. 1811 del Código Civil, 31 L.P.R.A. sec. 5171. *Viajes Lesana, Inc.* v. *Saavedra,* 115 D.P.R. 703 (1984); A. Gullón Ballesteros, *Comentarios al Código civil y compilaciones forales,* Madrid, Ed. Rev. Der. Privado, 1984, T. XXIV, pág. 662 y ss.; J. M. Manresa, *Comentarios al Código Civil Español,* 6ta ed. rev., Madrid, Ed. Reus, 1973, T. XII, págs. 928–929; J. Puig Brutau, *Fundamentos de Derecho Civil,* 2da ed. rev., Barcelona, Ed. Bosch, T. 1, Vol. II, págs. 5–27.

La redacción del Art. 1313 reproduce una obligación a título oneroso sobre los bienes muebles e inmuebles de la sociedad, en particular, aquella que confiere un derecho real sobre el objeto que se ofrece en garantía. De no ser así, el contenido del concepto de obligación en ambos artículos sería idéntico, conclusión que suscitaría una extraña e inexplicable contradicción legislativa. ¿Cómo se puede, de un lado, proteger a los cónyuges de actos de obligación directa cuando se sujeta un bien en específico y del otro, proclamar su indefensión por actos de obligación indirecta como lo son aquellos que comprometen todo el activo patrimonial de la sociedad?

■ Estas interrogantes penetraron prontamente el recinto judicial y dieron paso a los primeros importantes pronunciamientos tendentes a una máxima protección a los cónyuges. Así, atribuyéndole un sentido de *regla general* proclamamos que el inciso primero del Art. 1308 estaba supeditado a "la doctrina del provecho común o de la ausencia de fraude como limitación al carácter ganancial de [la] deuda". *Banco de Ahorro del Oeste* v. *Santos,* supra, pág. 76. De ahí evolucionamos el principio de que la presunción de gananciabilidad deri-

vada del Art. 1308 no tenía el alcance de imponer responsabilidad individual primaria y solidaria a los cónyuges. *Pauneto v. Núñez, supra.* De estas decisiones se desprenden las siguientes normas como criterios de aproximación judicial: (1) la deuda u obligación debe servir a un interés de la familia y no estar predicada en un ánimo fraudulento u oculto de perjudicar a uno de los cónyuges; (2) la carga de la prueba reposa en el cónyuge o la sociedad de gananciales que niegue responsabilidad. Esa carga puede invertirse con facilidad "[s]i tal cónyuge demuestra prima facie no haber recibido beneficio alguno de la obligación contraída, entre otros casos, se invierte la prueba", y (3) una vez controvertida la presunción, la responsabilidad de la sociedad legal de gananciales es subsidiaria, previa excusión de bienes conforme lo dispuesto en el Art. 1310 del Código Civil, 31 L.P.R.A. sec. 3663.

Estas normas corresponden a un adecuado balance de intereses entre el principio de igualdad de los componentes de la entidad conyugal y el de la seguridad y facilidad del tráfico comercial frente a terceros. *Banco de Ahorro del Oeste v. Santos, supra,* pág. 78. Sin embargo, su aplicabilidad imperativamente dependerá de los hechos particulares de cada caso. Examinemos el que nos ocupa.

■ Los autos reflejan incontrovertidamente que la obligación no es ni presuntiva ni concluyentemente ganancial. El contrato de arrendamiento nada tenía que ver con la sociedad Santana Cruz. Versaba sobre una entidad corporativa ajena a dicha entidad conyugal. Santana no podía obligar, como tal, a la sociedad ni personalmente a su cónyuge. De ser así se lesionarían irremediablemente los derechos inherentes a la personalidad de su esposa, que ante la ley goza plenamente de igualdad de facultades de obligación y disposición.

■ El acreedor WRC estaba consciente de la existencia de la sociedad de gananciales. Al aceptar únicamente la firma de Santana limitó los términos de su garantía a la sola persona

del cónyuge compareciente. Sus propios actos constituyen un impedimento para dirigir la causa de acción contra dicha entidad conyugal y la señora Cruz. Reiteramos que la protección del tráfico jurídico descansa en un estricto desconocimiento, *bona fide,* del status civil de la persona obligada. Un mínimo de diligencia, que se traduce en un deber jurídico insoslayable del acreedor de inquirir al obligado sobre este extremo, le brindaría protección adecuada. No existe otra solución. Recuérdese, que la capacidad de administración y representación *exclusiva* de uno de los cónyuges sólo puede ser conferida en virtud de un *mandato expreso* del otro cónyuge. Arts. 91 y 93 del Código Civil, 31 L.P.R.A. secs. 284 y 286. Aquí no existió. Erró el tribunal sentenciador al imponer responsabilidad a la sociedad legal de gananciales Santana Cruz. Sólo puede subsistir responsabilidad por la garantía en cuanto al Sr. Heriberto Santana en su carácter particular.

## IV

Réstanos considerar el ámbito de responsabilidad del recurrente Santana como fiador solidario.

■ De inmediato debemos aclarar que las figuras del deudor solidario y fiador solidario no son sinónimas. Hace dos décadas, en *Carr* v. *Nones,* 98 D.P.R. 236, 240–241 (1970) las estudiamos a fondo. Allí, invocando la doctrina española, resolvimos que el fiador solidario, salvo haber renunciado al privilegio de la excusión de bienes, una vez hecho el pago, conserva contra el deudor principal todos los derechos inherentes a la naturaleza del contrato de fianza, sin estar sujeto a las limitaciones propias del codeudor solidario.

Es en este contexto que procedemos a evaluar la responsabilidad de Santana como fiador solidario conforme a los términos del contrato.

■ En primer término, una lectura integral del mismo refleja que renunció a ser notificado y a las defensas ordinarias

que como fiador podía invocar. Se estipuló además una cláusula penal en caso de incumplimiento de la prestación debida. *Jack's Beach Resort, Inc.* v. *Cía. Turismo*, 112 D.P.R. 344, 348–352 (1982); *R. C. Leasing Corp.* v. *Williams Int. Ltd.*, 103 D.P.R. 163, 166–170 (1974). Esta última sustituye la indemnización de daños y abono de intereses. Art. 1106 del Código Civil, 31 L.P.R.A. sec. 3131. Por otro lado, la doctrina tiende a inclinarse a sostener que el fiador que expresamente garantiza una obligación principal está subordinado al cumplimiento de una cláusula penal. Lo determinante son los términos de la garantía que reflejan la intención de las partes. Art. 1726 del Código Civil, 31 L.P.R.A. sec. 4876; [4] V. Guilarte Zapatero, *Comentarios al Código civil y compilaciones forales*, Jaén, España, Ed. Rev. Der. Privado, 1979, T. XXIII, págs. 96–97; Manresa, *op. cit.*, págs. 340–341; A. Kemelmajer de Carlucci, *La Cláusula Penal*, Buenos Aires, Eds. Depalma, 1981, pág. 84; M. Albaladejo García, *Comentarios al Código civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1983, T. XV, Vol. 2, págs. 464–465; J. M. Lobato De Blas, *La cláusula penal en el Derecho español*, Pamplona, Eds. Univ. Navarra, 1974, págs. 128–130.

En el caso de autos, indubitadamente, el fiador solidario Santana se obligó expresamente al fiel cumplimiento de todas las condiciones del contrato principal, que incluía la cláusula penal.

En cuanto al alcance de esa cláusula penal nuestra interpretación jurisprudencial la mira con criterio restrictivo

---

[4] Manresa en su interpretación sostiene que: "[l]a responsabilidad del fiador, conforme a este precepto, se extiende incluso a los intereses por razón de mora del deudor. Así lo ha reconocido la jurisprudencia, declarando que subrogado el fiador en el lugar del deudor para hacer efectiva la obligación principal contraída, cuando éste no la cumple, responde no sólo de aquélla, sino también de sus consecuencias legales, una de ellas, en concepto de indemnización de perjuicios. . . ." J. M. Manresa, *Comentarios al Código Civil Español*, 6ta ed. rev., Ed. Reus, 1973, T. XII, pág. 341. Véase *Benero* v. *Alvarado et al.*, 39 D.P.R. 778, 784 (1929).

según enunciado por la doctrina española como corolario del principio *favor debitoris.* Albaladejo, *op. cit.*, págs. 462–465. No podemos olvidar que la equidad dimanante del Art. 1108 del Código Civil, 31 L.P.R.A. sec. 3133, faculta a un tribunal en su amplitud de remedios, inclusive a limitar el derecho inherente de una parte a resolver una obligación con cláusula penal. A su vez permite moderar la pena cuando la desproporción entre la infracción del contrato y la pena convencional es evidente. *Jack's Beach Resort, Inc.* v. *Cía. Turismo*, supra, pág. 352.

A la luz de todas las circunstancias presentes, habiendo optado el acreedor por resolver la obligación principal y el local arrendado, debemos atemperar el impacto de la cláusula penal convenida a tono con la índole del incumplimiento de la obligación principal y la intensidad del perjuicio ocasionado: falta de pago de dos cánones de renta correspondientes al cuarto (4) y quinto (5) mes de comenzada la relación arrendaticia. "El parámetro para proceder a la reducción es, como se observa, el perjuicio realmente sufrido, al ser menor, menor debe ser la cuantía de la pena." A. Orti Vallejo, *Nuevas perspectivas sobre la cláusula penal*, 85 Rev. Gen. Leg. Jur. 281, 317 (1982).

Concluimos que el monto total de la renta mínima representativa de diez y ocho (18) meses satisface justicieramente el balance de intereses económicos en conflicto. También será reducida, en igual proporción, la suma de $5,000 por concepto de gastos de mantenimiento a la cantidad de $1,800, y los honorarios a $1,500.

*Se dictará sentencia y se modificará la del Tribunal Superior, Sala de San Juan, según antes expuesto. Así modificada, subsistirá en sus restantes pronunciamientos. Continuarán en el foro de instancia los procedimientos compatibles con lo aquí resuelto.*