# 2006 DTA 94

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE BAYAMÓN**

R & G MORTGAGE CORPORATION
Demandante-Apelante

v.

NEIDA LETICIA FERMÍN TREMOLS; JAVIER SERRANO COLLAZO
Demandados-Apelados

Núm. KLAN-2003-00673

San Juan, Puerto Rico, a 29 de junio de 2006

Panel integrado por su Presidente, el Juez Vivoni del Valle,
y las Juezas Cotto Vives y Fraticelli Torres

Vivoní del Valle, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos mediante recurso de apelación R&G Mortgage Corporation ▮ (en adelante R&G o la apelante) y nos solicita que revoquemos la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Bayamón (en adelante TPI) del 25 de abril de 2003, notificada el 12 de mayo de 2003. En dicha sentencia, el TPI declaró *no ha lugar* la solicitud de desestimación y/o sentencia sumaria presentada por la Sra. Neida Leticia Fermín Tremols (en adelante señora Fermín) y dictó sentencia sumaria a favor de la allí demandante, R&G. El TPI ordenó a la señora Fermín y al Sr. Javier Serrano Collazo (en adelante señor Serrano) satisfacer las sumas de dinero adeudadas por concepto de mensualidades, costas, honorarios de abogados, penalidades e intereses vencidos y exigibles. A tales efectos, condenó a la señora Fermín y al señor Serrano al pago de $2,694.20 por concepto de las mensualidades sin pagar correspondientes a los meses de enero a abril de 2003. De igual manera, los obligó al pago de $1,300 en concepto de gastos y honorarios de abogado a favor de R&G, más los intereses legales correspondientes. Nada dispuso, sin embargo, la sentencia en lo relativo a la aceleración del pago del balance adeudado y la ejecución de la hipoteca, por lo que, inconforme, R.G. recurre mediante apelación ante nos.

Por los fundamentos que expondremos a continuación, modificamos la sentencia apelada y así modificada se confirma. Veamos los hechos.

### I

Allá para el 28 de octubre de 2000, la señora Fermín y el señor Serrano suscribieron un pagaré ante un notario, cuyo tenedor era R&G. El mencionado pagaré se otorgó por la suma principal de $70,000, a una tasa de interés del 9 ½% anual, garantizado por una hipoteca constituida sobre una finca, propiedad de la señora Fermín.

En lo pertinente, el contrato estipuló lo siguiente:

"*De radicarse procedimiento judicial para el cobro de este pagaré, el tenedor de este pagaré tendrá derecho a cobrar en dicho procedimiento la suma pactada y líquida del **diez porciento de la suma original del principal del presente para cubrir las costas y gastos de dicho procedimiento, incluyendo, sin implicar limitación, honorarios de abogado**.*" (Énfasis nuestro)

De otra parte, la señora Fermín y el señor Serrano se obligaron a llevar a cabo 360 pagos mensuales por $588.60 comenzando el 1 de diciembre de 2000 hasta el 1 de noviembre de 2030.

La señora Fermín y el señor Serrano incumplieron con los pagos acordados. Por tal razón, el 23 de septiembre de 2002, R&G incoó una demanda en cobro de dinero y ejecución de hipoteca en el TPI en contra de

ellos. En esencia, R&G reclamó las mensualidades adeudadas, los cargos por mora e intereses y la ejecución de la hipoteca. Indicó, además, que los deudores se obligaron a pagar las costas y honorarios del litigio en caso de que hubiese una reclamación de pago por la vía judicial, por lo que procedía la concesión de dicha partida.

Posteriormente, el 3 de diciembre de 2002, la señora Fermín presentó una "*Moción de Consignación y de Desestimación*". En la misma adujo que, con anterioridad a la presentación de la demanda, específicamente el 4 de septiembre de 2002, acudió a R&G con el dinero para poner al día la deuda y allí le informaron que tenía que pagar unos gastos adicionales. Sostuvo que R&G no quiso recibir el dinero a pesar de las diversas gestiones que llevó a cabo para el pago de la deuda. Alegó que, días después de recibir la demanda en cobro de dinero, se personó en R&G para saldar la deuda y que nuevamente le informaron que tenía que pagar unos gastos adicionales. Según se desprende de la "*Moción de Consignación y de Desestimación*", la señora Fermín entendió que no tenía que pagar la cantidad solicitada por R&G, pues opinaba que ésta era irrazonable. A tales efectos, acompañó la mencionada moción de un cheque por $4,580. Señaló que la consignación de la dicha cantidad saldaba la deuda, por lo que procedía la desestimación de la demanda en su contra. ■

Entre tanto, el 30 de diciembre de 2002, la señora Fermín presentó una nueva "*Moción de Consignación, Solicitud de Desestimación, Solicitud de Sentencia Sumaria y Otros Extremos*". En la misma adujo que acudió a R&G para saldar la deuda y allí le indicaron que tenía que llevar a cabo unas correcciones al cheque a ser consignado. Señaló que luego de llevar a cabo los cambios pertinentes, presentó ante el TPI la "*Moción en Solicitud de Desestimación y/o Sentencia Sumaria*", a la que anejó un cheque por $5,209. La señora Fermín alegó en la moción que dicho cheque incluia el pago para diciembre de 2002 y sostuvo éste que cubría todo el balance de los meses atrasados y los posibles cargos por demora que aplicaran. A tales efectos, arguyó que procedía la desestimación de la demanda, pues ésta dejaba de exponer una reclamación que justificara la concesión de un remedio. Alegó, en la alternativa, que procedía el TPI dictara sentencia sumaria, pues no había duda de que ella había pagado lo adeudado. Tampoco expresó, sin embargo, que existían hechos en controversia ni cuestiones de credibilidad a dirimir.

El 19 de febrero de 2003, R&G presentó una "*Oposición a Moción de Consignación y a Solicitud de Desestimación y/o Sentencia Sumaria*". En esencia, R&G adujo que el pago consignado por la señora Fermín no incluia gastos, costas y honorarios de abogado pactados entre las partes e incurridos en la reclamación. ■ Sostuvo que las alegaciones de la señora Fermín eran frívolas, pues no tomaban en cuenta las cláusulas y condiciones del contrato suscrito por las partes. Añadió, además, que la señora Fermín no especificó qué gastos consideraba irrazonables. A su vez, R&G argumentó que el dinero adeudado eran intereses moratorios garantizados por la hipoteca. Adujo que dicha suma la podía cobrar, ya que la normativa jurídica vigente esgrime que una hipoteca garantiza no sólo el principal del préstamo o crédito concedido por el acreedor hipotecario, sino también los créditos accesorios. ■

El 26 de marzo de 2003, R&G presentó una "*Moción Suplementando Oposición a Moción de Consignación y a Solicitud de Desestimación y/o Sentencia Sumaria*". En ésta básicamente reiteró lo explicado en su oposición original a los efectos de que la cantidad adeudada consistía de mensualidades, cargos por mora, costas legales, gastos y honorarios de abogado. Apuntó que el dinero consignado por la señora Fermín en concepto de atrasos y cargos por demora tampoco correspondía a la cantidad adeudada, pues ésta otorgó un cheque por $5,209 en lugar de $5,388.40. Añadió que dicha cantidad tampoco incluia los gastos y honorarios de abogado, así como tampoco los pagos mensuales y atrasos correspondientes a enero, febrero y marzo de 2003, los cuales, a la fecha de los hechos, todavía no había consignado. Por lo tanto, solicitó se declarara sin lugar la moción de desestimación y/o de sentencia sumaria.

Sometidas las controversias, el TPI resolvió, el 25 de abril de 2003, por la vía sumaria, el pleito a favor de R&G y declaró *no ha lugar* la solicitud de sentencia sumaria y/o desestimación presentada por la señora Fermín. El TPI entendió que no había controversia sobre la existencia, validez, vencimiento y exigibilidad de la

obligación a favor de R&G. Consecuentemente, concluyó que tanto la señora Fermín como el señor Serrano eran responsables por las sumas de dinero adeudadas por concepto de mensualidades, costas, honorarios de abogados, penalidades e intereses vencidos y exigibles. A tales efectos, los condenó al pago de $2,694.20 por concepto de las mensualidades correspondientes a los meses de enero a abril de 2003. De igual forma, obligó a que pagaran $1,300 en concepto de gastos y honorarios de abogado a favor de R&G, más los intereses legales correspondientes.

Insatisfecha con el aludido dictamen, el 23 de mayo de 2003, la señora Fermín presentó una *"Moción de Reconsideración, Relevo de Sentencia y Otros Extremos"* en la cual esbozó que hizo esfuerzos para pagar el dinero adeudado antes y después de la presentación de la demanda, lo que demostraba que siempre quiso pagar lo adeudado. Finalmente, solicitó al TPI que reconsiderara su posición y que dejara sin efecto la sentencia dictada y señalara vista para discutir la solicitud que anteriormente ésta hiciera a los efectos de que se desestimara o, en la alternativa, se dictara sentencia sumaria a su favor.

Días más tarde, el 27 de mayo de 2003, R&G presentó una *"Moción de Reconsideración"*. En la misma, alegó que el contrato suscrito por las partes otorgaba la discreción de ejercitar la opción de aceleración si se incoaba una demanda, cantidad que ascendía a $63,376.04. ■ Adujo R&G que en el contrato los allí demandados se obligaron al pago de 10% de la suma del principal del préstamo en concepto de gastos y honorarios de abogado en caso de que se provocara una demanda. Por consiguiente, alegó que el TPI debía condenarlos al pago de $7,000 en costas, gastos y honorarios de abogado.

Aunque del recurso no se desprende la decisión del TPI en torno a la moción de reconsideración, obviamente el plazo dispuesto por las Reglas de Procedimiento Civil transcurrió sin que éste se expresara al respecto.

Inconforme, la R&G presentó ante nos el recurso de apelación de autos. Aduce que el TPI cometió los siguientes errores:

*"Erró el Tribunal de Primera Instancia al no ordenar la aceleración del pago del balance total adeudado del préstamo, según pactado entre las partes, y la ejecución de la hipoteca en defecto de dicho pago.*

*Erró el Tribunal de Primera Instancia al no ordenar el pago de una suma equivalente al 10% de la suma principal del préstamo, por concepto de gastos y honorarios de abogado, según pactado entre las partes y la ejecución de la hipoteca en defecto del pago de dicha cantidad."*

El 15 de julio de 2003, la parte apelada señaló en su *"Moción Solicitando Término Adicional"* que necesitaba un término adicional para poder revisar lo alegado en el recurso de apelación. Examinada dicha moción, concedimos un plazo de 20 días contados a partir de la notificación de nuestra resolución para que compareciera por escrito.

El 11 de febrero de 2005, la parte apelada nos expuso en la *"Moción Informativa y en Cumplimiento de Orden"* que la señora Fermín había presentado una solicitud de quiebra al amparo del Capítulo 13 de la Ley de Quiebras. La mencionada moción estaba acompañada de una notificación emitida el 12 de octubre de 2004 por el Tribunal de Quiebras del Distrito de Puerto Rico la cual ordenaba la paralización todos los procedimientos en su contra a tenor con las secciones 362 y 1301 del Código de Quiebras, 11 U.S.C. secs. 362 y 1301. Así pues, ordenamos, para fines estadísticos únicamente, el archivo administrativo del recurso de apelación. Determinamos que, una vez concluyesen los procedimientos ante el Tribunal de Quiebras, la señora Fermín debía así notificarlo para reabrir el caso y pautar la continuación de los procedimientos. ■

En el presente año, específicamente el 11 de abril de 2006, R&G, en la *"Moción Asumiendo Representación*

*Legal, Solicitud de Reapertura y Continuación de los Procedimientos*", solicitó la continuación de los procedimientos del caso de epígrafe, toda vez que el Tribunal de Quiebras le otorgó un *"Order Dismissing Case"*. ■ Atendida dicha moción, la declaramos *con lugar*.

El 15 de mayo de 2006, la apelante presentó una *"Moción Solicitando Consideración de Recurso"*. Ante la reapertura de los procedimientos, la apelante solicitó a este Tribunal que considerara el recurso de apelación radicado el 12 de junio de 2003. Examinada la mencionada moción, concedimos un término de 30 días a partir de la notificación de nuestra resolución de 18 de mayo de 2006 y notificada el 25 de mayo de 2006 para que la parte apelada presentara su alegato.

Días después, el 19 de mayo de 2006, la apelada presentó una *"Moción en Solicitud de Término Adicional"* en la cual se solicitó un término de 30 días para presentar el alegato en oposición al recurso de apelación. Atendida dicha moción, determinamos que desde el 18 de mayo de 2006, mediante resolución, habíamos concedido el término solicitado. Sin embargo, la apelada no presentó su alegato.

## II

Es norma reiterada que la moción de sentencia sumaria regulada por la Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 36, permite al tribunal disponer de un caso sin celebrar vista en su fondo en aquellas situaciones en que la parte que la solicita demuestra que no existe controversia en cuanto a los hechos esenciales alegados en la demanda y que tan sólo resta disponer de las controversias de derecho existentes. *PFZ Properties, Inc. v. General Accident Insurance Company*, 136 D.P.R. 881 (1994); *Medina Morales v. Merck Sharp & Dohme*, 135 D.P.R. 716 (1994).

Sabido es que el propósito de la sentencia sumaria es aligerar la tramitación de los casos en forma justa, rápida y económica, permitiendo que se dicte sentencia cuando de los documentos surge que no existe disputa sobre un hecho esencial y sólo resta aplicar el derecho, por lo que resulta innecesario celebrar un juicio en su fondo. *Rosario* v. *Nationwide Mutual*, Opinión del 4 de marzo de 2003, 158 D.P.R. ___ (2003), **2003 J.T.S. 34**.

En este contexto, un tribunal debe analizar si existen o no controversias en cuanto a los hechos y que en derecho procede emitir sentencia a favor de la parte que la solicita. No cabe duda que un tribunal debe dictar sentencia sumaria a favor de la parte promovente si de los autos y de los documentos presentados en apoyo y oposición de dicha moción surge que no existe controversia alguna en cuanto a los hechos esenciales y que, como cuestión de derecho, procede que se dicte la misma a favor de la aludida parte. Sin embargo, como dicha determinación requiere la adjudicación de un litigio sin que las partes tengan la oportunidad de presentar su caso ante el tribunal, la jurisprudencia ha concebido la sentencia sumaria como un remedio extraordinario que sólo debe concederse cuando el promovente ha establecido su derecho con claridad. *Benítez et als. v. J&J*, Opinión del 30 de septiembre de 2002, 158 D.P.R. ___ (2002), **2002 J.T.S. 137**, *García v. Darex P.R. Inc.*, 148 D.P.R. 364 (1999). Además, se puede conceder la sentencia sumaria cuando el promovente ha tenido una oportunidad adecuada de demostrar que el oponente no tiene derecho a que se dicte sentencia en su favor como cuestión de derecho. *González Pérez v. E.L.A.*, 138 D.P.R. 399 (1995); *M.J.C.A. menor v. Julio E. menor*, 124 D.P.R. 910 (1989).

De otro lado, le corresponde a la parte promovida rebatir dicha moción por vía de declaraciones juradas u otra documentación que apoye su posición, pues si bien el no hacerlo necesariamente no significa que ha de emitirse el dictamen sumario automáticamente en su contra, tal omisión lo pone en riesgo de que ello ocurra. *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1987). Esto significa que toda duda sobre si un hecho fue controvertido debe resolverse a favor de la parte que se opone a la moción porque en esta etapa del procedimiento el juez no debe considerar la credibilidad de los documentos.

La Regla 36.3 de las de Procedimiento Civil impone además al juez que atiende una solicitud de sentencia

sumaria la obligación de considerar, no sólo las declaraciones juradas sometidas para sustentarlas o las contra declaraciones juradas de la parte contraria, sino también *"las alegaciones, [deposiciones], contestaciones a interrogatorios y admisiones ofrecidas"*, amén de *"todo documento admisible en evidencia"* que obre en autos. *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 D.P.R. 599, 610 (2000).

Al tenor de esta obligación, el juzgador debe analizar concienzudamente la moción de sentencia sumaria y su oposición, con sus respectivos anejos y el expediente en su totalidad, con el propósito de determinar si queda algún hecho material en controversia o si existen alegaciones afirmativas en la demanda que no han sido refutadas. En cualquiera de dichos casos, de ello ser así, el tribunal deberá denegar la solicitud de sentencia sumaria. *Corp. Presiding Bishop CJC of LDS v. Purcell, supra.* Una vez el tribunal tiene ante sí todos los documentos, debe analizar los hechos en la forma más favorable a la parte que se opone a que se dicte sentencia sumaria. *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867 (1992). En resumen, si un tribunal tiene duda sobre la existencia o no de una controversia de hechos en el caso bajo su consideración, esa duda derrota la moción de sentencia sumaria. *Corp. Presiding Bishop CJC of LDS v. Purcell, supra.* Así, *"sólo procede dictar sentencia sumaria cuando surge claramente que el promovido por la moción no puede prevalecer bajo ningún supuesto de hechos y que el tribunal cuent[a] con la verdad de todos los hechos necesarios para poder resolver la controversia. Cuando no existe una clara certeza sobre todos los hechos de la controversia, no procede una sentencia sumaria"*. *Mgmt. Adm. Servs. Corp. v. E.L.A., supra*, pág. 440.

Por último, se ha resuelto por nuestro más alto foro que *"hay litigios y controversias que por la naturaleza de los mismos no hacen deseable o aconsejable resolverlos mediante una sentencia sumariamente dictada, porque difícilmente en tales casos, el Tribunal puede reunir ante sí toda la verdad de los hechos a través de 'affidávits' [sic] o deposiciones"*. *Rosario v. Nationwide Mutual, supra*, págs. 641-642.

## III

Por otro lado, es principio reiterado de derecho que los contratos son negocios jurídicos que existen desde que concurren los requisitos de consentimiento, objeto y causa; y desde ese momento, producen obligaciones que tienen fuerza de ley entre las partes contratantes. Arts. 1213 y 1044 de Código Civil, 31 L.P.R.A. secs. 3391 y 2994; *Master Concrete Corp. v. Fraya S.E.*, 152 D.P.R. 616 (2000). Por tanto, los tribunales de justicia no pueden relevar a una parte de cumplir con lo que se obligó a hacer mediante contrato cuando dicho contrato es legal y válido, y no contiene vicio alguno. *De Jesús González v. A.C.*, 148 D.P.R. 255, 271 (1999); *Mercado, Quilinchini v. U.C.P.R.*, 143 D.P.R. 610, 627 (1997); *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345, 351 (1984); *Olazábal v. U.S. Fidelity, etc.*, 103 D.P.R. 448, 462 (1975).

Nuestro ordenamiento jurídico dispone que los contratos son fuente de obligaciones que se perfeccionan desde que las partes contratantes consienten voluntariamente a cumplir con los mismos. Las partes contratantes no solamente se obligan a lo pactado, sino también a toda consecuencia que sea conforme a la buena fe, al uso y a la ley. Art. 1210 de Código Civil, 31 L.P.R.A. sec. 3375; *Trinidad v. Chade*, 153 D.P.R. 280 (2001); *Amador v. Conc. Igl. Univ. de Jesucristo*, 150 D.P.R. 571, 582 (2000).

El Tribunal Supremo ha resuelto que los contratos tienen fuerza de ley entre las partes, las cuales tienen que cumplir con lo acordado, siempre y cuando no se viole la ley, la moral ni el orden público. Art. 1207 de Código Civil, 31 L.P.R.A. sec. 3372; *Jarra Corp. v. Axxis Corp.*, 155 D.P.R. 764 (2001). Sin embargo, también se ha dispuesto que algunos contratos requieren un ejercicio de interpretación para poder determinar la naturaleza de la obligación en que incurrieron las partes. Por esa razón, el Código Civil de Puerto Rico establece ciertas disposiciones para la interpretación de los contratos. La primera regla establece que se debe atender el texto claro de sus cláusulas, cuando las mismas reflejan claramente la intención de las partes. A esos efectos, el Artículo 1233 del Código Civil dispone lo siguiente:

*"Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará*

244

*al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerán ésa sobre aquellas."* 31 L.P.R.A. sec. 3471; *Caguas Plumbing v. Continental Const. Corp.,* 155 D.P.R. 744 (2001).

En síntesis, cuando los términos de un contrato son claros y no dejan lugar a dudas sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación. Art. 1233 del Código Civil, sec. 3471; *Irizarry López v. García Cámara,* 155 D.P.R. 713 (2001); *Trinidad García v. Chade, supra; Marcial Burgos v. Tomé,* 144 D.P.R. 522, 536 (1997). Aún así, hay ocasiones en que no es posible determinar la voluntad de los contratantes con la mera lectura literal de las cláusulas contractuales. *Irrizary López v. García Cámara, supra.* El Artículo 1234 del Código Civil, sec. 3472, establece que se podrá juzgar la voluntad de los contratantes por los actos anteriores, coetáneos y posteriores al perfeccionamiento del contrato.

En ese contexto, establece el Artículo 1235 del Código Civil, sec. 3473, que *"[c]ualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquéllos sobre que los interesados se propusieron contratar".* Además, el Artículo 1236 del Código Civil, sec. 3474, dispone que *"[s]i alguna cláusula de los contratos admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto".* Por lo tanto, si bien hay que considerar la intención de las partes para interpretar los contratos, la interpretación tiene que ser cónsona con el principio de la buena fe y no puede llevar a resultados incorrectos, absurdos e injustos. *Irizarry López v. García Camara, supra.* Tampoco puede llevar a resultados contrarios al texto del contrato.

Finalmente, nuestro ordenamiento jurídico en materia de contratos también reconoce las obligaciones con cláusula penal. *R. C. Leasing Corp. v. Williams Int. Ltd.,* 103 D.P.R. 163, 168 (1974). Claro está, la cláusula penal cumple un fin coercitivo y punitivo. *R.C. Leasing Corp. v. Williams Int. Ltd., supra,* a la pág. 170. Esta figura jurídica proviene del derecho romano y consiste en garantía del derecho de crédito, D.E. Espín, *La cláusula penal en las obligaciones contractuales,* 30 Rev. Der. Priv. 145, 146 (1946). La doctrina la ha definido como una *"estipulación de carácter accesorio, establecida en un contrato, con la finalidad de asegurar el cumplimiento de la obligación principal, en virtud de la que el deudor de la prestación que se trata de garantizar viene obligado a pagar, por lo general, determinada cantidad de dinero".* *Levitt & Sons of P.R., Inc. v. D.A.C.O.,* 105 D.P.R. 184, 193 (1976).

Los efectos de la cláusula penal sólo se producen cuando se incumple con la obligación principal. El incumplimiento total, parcial, defectuoso o tardío por parte del obligado, es la *conditio iuris* que provoca la eficacia de la cláusula penal. El sólo hecho del incumplimiento implica que la pena ha de pagarse y tal incumplimiento debe ser por causa imputable al deudor, José Puig Brutau, *Fundamentos de Derecho Civil,* 4ta. Ed., Tomo 1, Volumen 2, Barcelona, Bosch, 1988, a las páginas 451-452. No obstante, el Código Civil le impide tanto al deudor eximirse de cumplir la obligación pagando la pena, como al acreedor exigir conjuntamente el cumplimiento de la obligación y la satisfacción de la pena, excepto en aquellos casos en que se les haya otorgado expresamente ese poder, Artículo 1107 del Código Civil, 31 L.P.R.A. sec. 3132.

Se conoce esta cláusula como *"pena convencional",* por el elemento de coerción y de amenaza que apremia al deudor al cumplimiento. *Jack's Beach Resort, Inc. v. v. Cía. Turismo,* 112 D.P.R. 344, 349 (1982). Por su carácter punitivo o sancionador, el alcance de una cláusula penal se interpreta restrictivamente. *WRC Props., Inc. v. Santana,* 116 D.P.R. 127, 137-138 (1985).

Así pues, la cláusula penal cumple importantes funciones, tiene un fin coercitivo, punitivo y liquidador de los daños y perjuicios que represente. Por esa función de apremio o estímulo al cumplimiento de la obligación asegurada, se le conoce también como cláusula *in terrores,* José Ramón Vélez Torres, *Derecho de Obligaciones, Curso de Derecho Civil,* 2da. Ed., San Juan, Facultad de Derecho U.I.P.R., 1997, a las páginas 299-300. En resumen, se pacta una cláusula penal para asegurar el cumplimiento de la obligación y para evaluar

por anticipado el perjuicio que sufriría el acreedor con el incumplimiento de la obligación por parte del deudor, *Jack´s Beach Resort, Inc. v. Cía. Turismo*, 112 D.P.R. 344, 348-349 (1982); *Levitt & Sons of P.R., Inc. v. D.A. C.O.*, *supra*, a la página 193; *R.C. Leasing Corp. v. Williams Int. Ltd.*, *supra*, a las páginas 169-170.

Desde luego, como remedio en equidad contra el rigor o la excesiva onerosidad de la cláusula penal, el Artículo 1108 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3133, dispone que *"[e]l tribunal o el juez modificará equitativamente la pena cuando la obligación principal hubiera sido en parte o irregularmente cumplida por el deudor."*

La equidad proveniente del Artículo 1108, 31 L.P.R.A. sec. 3133, faculta a un tribunal *"en su amplitud de remedios, inclusive a limitar el derecho inherente de una parte a resolver una obligación con cláusula penal. A su vez, permite moderar la pena cuando la desproporción entre la infracción del contrato y la pena convencional es evidente"*. *WRC Props., Inc. v. Santana*, *supra*, a la pág. 138.

En otras palabras, el tribunal deberá atemperar el impacto de la cláusula penal convenida a tono con la índole del incumplimiento de la obligación principal y la intensidad del perjuicio ocasionado. *Id*. Según expone nuestro Tribunal Supremo, lo esencial es determinar cuál es el perjuicio realmente sufrido. Mientras menor sea el perjuicio, *"menor debe ser la cuantía de la pena"*. *Id.*, citando a A. Ortiz Vallejo, *Nuevas perspectivas sobre la cláusula penal*, 85 Rev. Gen. Leg. Jur. 281, 317 (1982).

En otras palabras, no se trata de eliminar la efectividad de la cláusula penal, sino de modificarla equitativamente con arreglo a las circunstancias que concurran en cada caso. Cualquier norma en contrario tendría el efecto de incidir con el principio de autonomía contractual. *Mun. de Ponce v. Gobernador*, 136 D.P. R. 776, 787 (1994). Es decir, el tribunal deberá *"dirigirse a una adecuación que sin eliminar el carácter penal de la cláusula, reduzca la pena a una más justa proporción al grado de culpa y la dimensión del perjuicio ocasionado."* *Jack´s Beach Resort, Inc. v. Cía. Turismo*, *supra*, a la pág. 353.

Al limitar el alcance de la moderación de la pena, el Tribunal Supremo expresó lo siguiente:

*"La facultad judicial de moderación debe usarse sólo con gran cautela y notoria justificación. (S. De 13 junio, 1944). Al resultado de frenar el predominio absoluto de la autonomía de la voluntad, bien moderando los efectos de los contratos, ya limitando su obligatoriedad según normas de buena fe, ha de llegarse únicamente en circunstancias extraordinarias, como medio de templar su excesiva onerosidad para el obligado, o la desorbitada desproporción."* Bonet Ramón, *Código Civil Comentado*, 2da. ed., 1964, pág. 959. Véase además *Jack´s Beach Resort, Inc. v. Cía. Turismo*, *supra*.

## IV

En el caso de autos, la apelante sostiene que el TPI erró al no haber acelerado el pago del balance total adeudado del préstamo según lo pactado entre las partes y al no ejecutar la hipoteca en defecto de dicho pago. No le asiste la razón.

En el caso de epígrafe, no existe controversia alguna de hecho entre las partes. Incontrovertiblemente, la parte apelada incumplió con la obligación de pagar los intereses y mensualidades según lo acordado en el pagaré, lo que propició se instara la presente acción judicial. Sin embargo, intentaron saldar los pagos adeudados, los cuales no fueron aceptados por la apelante, pues ésta entendía que los aquí apelados venían obligados a pagar unas sumas por concepto de cargos por mora e intereses. Por tal razón, R&G incoó un pleito en cobro de dinero y ejecución de hipoteca. En consecuencia, la señora Fermín, aquí apelada, consignó ante el TPI el pago de las mensualidades, cargos por mora e intereses hasta diciembre de 2002. R&G, sin embargo, sostuvo que la apelada no había consignado la suma por concepto de costas, gastos y honorarios de abogado, así como los pagos mensuales y por mora de enero a abril de 2003, a tenor con lo estipulado en el pagaré, sumas

concedidas por el TPI.

A tales efectos, alega R&G que el contrato estipulaba que ellos podían ejercer la opción de aceleración durante cualquier incumplimiento del deudor. Sostiene que el incumplimiento objeto del caso de epígrafe causó que la apelada se convirtiera en responsable por el pago del balance adeudado de la suma principal del préstamo.

En ese contexto, recordemos, que la normativa jurídica prevaleciente señala que cuando es evidente una desproporción entre la infracción del contrato y la pena convenida en la cláusula de aceleración, los tribunales pueden modificar la misma o, inclusive, limitar el derecho inherente de una parte a resolver una obligación con cláusula penal, *WRC Props., Inc. v. Santana, supra*. Por consiguiente, cuando existe una desproporción entre la infracción al contrato y la pena, no se ejercitará la cláusula de aceleración. *WRC Props., Inc. v. Santana, supra*; *Jack's Beach Resort, Inc. v. Cía. Turismo*, 112 D.P.R. a la pág. 352. A tales efectos, el Artículo 1108 del Código Civil, sec. 3133, establece como medida para atemperar la excesiva onerosidad de una cláusula de aceleración la facultad de los tribunales de modificarla cuando la obligación principal hubiera sido en parte o irregularmente cumplida por el deudor.

Ciertamente, en el caso ante nuestra consideración, implantar la cláusula de aceleración, a nuestro juicio, sería una pena excesiva, debido a que los apelados ciertamente llevaron a cabo esfuerzos para consignar los plazos adeudados y los recargos por su atraso. Por tal razón, requerir el pago de la totalidad de la deuda sería una penalidad desproporcionada y onerosa para la apelada. En consecuencia, resolvemos que el TPI no erró al implantar su facultad moderadora y no aplicar la cláusula de aceleración del contrato. No tiene razón la apelante cuando sostiene que el TPI debió ordenar el pago del balance total adeudado del préstamo. No se cometió el primer error señalado.

Por otro lado, en su segundo error, la apelante apunta que el TPI incidió al no ordenar el pago de una suma equivalente al 10% del principal del préstamo, por concepto de gastos y honorarios de abogado, según pactado entre las partes y la ejecución de la hipoteca en defecto del pago de dicha cantidad. No hay duda que las partes estipularon en el pagaré que, de radicarse un procedimiento judicial para el cobro del mismo, los aquí apelados pagarían el equivalente a 10% de la suma principal del préstamo, que ascendía a $70,000, para cubrir las costas y gastos de dicho procedimiento, incluyendo los honorarios de abogado.

Como en realidad hubo una reclamación judicial por parte de R&G para el cobro de ciertas cantidades adeudadas, los apelados ciertamente están obligados al pago del 10% de la suma principal del préstamo, según lo acordado en el contrato. Por todo lo anteriormente expuesto, resolvemos, pues, que tienen razón los apelantes al sostener que procedía el pago de dicha cantidad. Se cometió el segundo error señalado por el apelante y la sentencia amerita ser modificada.

## V

Por los fundamentos anteriormente expuestos, se modifica la sentencia del Tribunal de Primera Instancia a los fines de ordenar a los apelados al pago del 10% de la suma principal del préstamo, es decir, $7,000 y, así modificada, se confirma.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones

**1.** R&G Mortgage Corporation es una corporación organizada bajo las Leyes del Estado Libre Asociado de Puerto Rico.

**2.** El 18 de 2002, R&G presentó una *"Moción Solicitando Prórroga"* en la que solicitó 30 días para presentar un escrito en respuesta a la *"Moción de Consignación y Desestimación"* presentada por la demandada. El TPI declaró la misma *ha lugar*.

**3.** R&G adujo, además, que la cantidad que correspondería como gastos, costas y honorarios eran $7,000. Esto es el 10% de $70,000. No obstante, R&G señala que para noviembre de 2002 sólo se le imputó $1,221.20 de los $7,000 pactados.

**4.** R&G citó el Artículo 1061 del Código Civil, 31 L.P.R.A. sec. 3025, el cual establece: *"Si la obligación consistiere en el pago de una cantidad de dinero y el deudor incurriere en mora, la indemnización en daños y perjuicios, no habiendo pacto en contrario, consistirá en el pago de los intereses convenidos...".*

**5.** Además, sostuvo que procedía el pago de $3,295.36 en intereses acumulados al 1 de octubre de 2002, los cuales continuaban acumulando $18.06 diarios. Asimismo, alegaron que los allí demandados debían $117.72 en concepto de recargos y que continuaban acumulándose al 5% de aquellos pagos con atrasos en exceso de 15 días calendarios de la fecha de vencimiento. De igual manera, arguyeron que los allí demandados adeudaban cargos por la suma de $75.00 por la inspección de la propiedad.

**6.** El 11 de enero de 2006, el Bufete Goldman, Antonetti y Córdova, P.S.C. solicitó ser relevado de la representación legal de R&G Mortgage Corporation para propósitos del caso de epígrafe. Atendida dicha moción, la declaramos *con lugar*.

**7.** Anunció, además, la nueva representación legal.