El Juez Asociado Señor Kolthoff Caraballo
emitió la opinión del Tribunal.
En esta ocasión nos corresponde determinar si surte efectos en nuestra jurisdicción un contrato suscrito en el estado de Florida por unos cónyuges puertorriqueños suje-tos al régimen de la Sociedad Legal de Bienes Gananciales, mediante el cual transfieren a uno solo de estos la titula-ridad exclusiva de un bien inmueble sito en ese estado. Por los fundamentos que se discuten en la opinión, responde-mos tal interrogante en la afirmativa.
I
La Sra. Ruth N. Rodríguez Cruz y el Sr. Carlos Roselló Puig contrajeron nupcias el 25 de junio de 1978 en San Juan, Puerto Rico. El régimen económico bajo el cual cons-tituyeron su matrimonio fue el de la Sociedad Legal de Bienes Gananciales. Luego de concretado el vínculo matrimonial, los cónyuges vivieron y adquirieron varios bienes inmuebles en la Isla. Posteriormente se mudaron al estado de Florida donde adquirieron una propiedad inmueble en el condado de Seminole.
Ahora bien, mediante una escritura intitulada “Warranty Deed”, otorgada por el matrimonio en el estado de Fio- *86 rida el 29 de abril de 1997, y según lo permiten las leyes de ese estado,(1) el señor Roselló Puig le transfirió su partici-pación en el inmueble sito en el condado de Seminole a la señora Rodríguez Cruz por la cantidad de diez dólares “and other valuable consideration”. El propósito del contrato fue que, según las leyes del estado de Florida, la propiedad dejara de ser ganancial y se convirtiera en privativa de la esposa.
El 7 de abril de 2003, el vínculo matrimonial se declaró disuelto cuando el Tribunal de Primera Instancia, Sala Superior de Bayamón, decretó el divorcio por la causal de separación. Sin embargo, no se procedió con la división de bienes gananciales de inmediato, sino que se configuró una comunidad de bienes posganancial. Estando en comuni-dad, la señora Rodríguez Cruz vendió el inmueble sito en el estado de Florida.
El 27 de octubre de 2003, el señor Roselló Puig presentó una demanda mediante la cual solicitó la división de la comunidad de bienes posganancial generada entre él y su exesposa. Entre otras cosas, adujo que el producto de la venta del inmueble localizado en el estado de Florida era parte de la comunidad y no privativo de su excónyuge. Alegó que si bien fue transferido a la señora Rodríguez Cruz durante la vigencia del matrimonio, él continuó rea-lizando los pagos del préstamo hipotecario del inmueble hasta agosto de 2003, fecha en que la señora Rodríguez Cruz lo vendió por la cantidad de $450,000.
*87 Manifestó que en vista de que la propiedad fue adqui-rida mientras estaban casados, esta le pertenecía a la So-ciedad de Bienes Gananciales aun cuando se encuentra a nombre de uno de los consortes. A esos efectos, adujo que el 50% del dinero producto de esa venta le correspondía a él, ya que el inmueble le pertenece a la comunidad que es objeto de la división o que, en su defecto, se le debía reco-nocer el crédito correspondiente.
La señora Rodríguez Cruz contestó la demanda y admi-tió que, vigente el matrimonio, compareció junto a su ex-marido como codeudora de la deuda hipotecaria asumida por ambos para la obtención del inmueble. Ahora bien, alegó que el inmueble debía ser considerado privativo puesto que posteriormente ella lo adquirió mediante un contrato otorgado al amparo de las leyes del estado de Florida, jurisdicción donde se permite la contratación entre cónyuges. A esos efectos, aclaró que “[l]as mensualidades de la hipoteca fueron satisfechas con bienes de la Sociedad Legal de Gananciales desde que la misma fue incurrida hasta aproximadamente el mes de agosto de 2003”. (2) Por ello, reclamó ser acreedora de un crédito por el dinero pri-vativo que tuvo que utilizar al momento de la venta del inmueble para satisfacer el resto de la deuda hipotecaria.
El señor Roselló Puig replicó lo referente al crédito solicitado. Sin embargo, al refutar la procedencia del cré-dito, se mostró conforme con el carácter privativo de la propiedad. Esto es, al reconocer que, en efecto, la titulari-dad exclusiva de la propiedad de Florida había sido cedida a su excónyuge, expresó:
La demandada a trav[é]s de esta cesión no tan solo aceptfó] toda participación de la referida propiedad, sino tambi[é]n la obligación económica futura que esto conllevaba, por tanto [,] y como expresa en la Contestación de la demanda, existen unos créditos de la Sociedad Legal de Gananciales, no obstante, no existen créditos a favor de la demandada ya que simplemente *88 ella cumplió con su obligación econ[ó]mica para con su bien privativo.(3)
Así alegado, el 7 de diciembre de 2004 el Tribunal de Primera Instancia celebró una vista para la discusión de varios asuntos, entre ellos, la controversia surgida en cuanto a si el inmueble sito en el estado de Florida era un bien ganancial o privativo. Las partes acordaron presentar escritos mediante los cuales fundamentarían sus respecti-vas posiciones.
El 13 de diciembre de 2004, el señor Roselló Puig acudió al foro primario en auxilio de su jurisdicción para que le ordenara a su exesposa que, consignara los frutos de la venta del inmueble hasta que se resolviera definitiva-mente la controversia. Se fundamentó en que, como consi-deraba que la propiedad formaba parte de la comunidad de bienes que pretendía dividir, se afectaría su derecho a la parte del producto de la venta que le correspondía, pues la señora Rodríguez Cruz había aceptado que utilizaba ese dinero para cubrir gastos personales.
La señora Rodríguez Cruz, por su parte, se reafirmó en que la propiedad se tenía que considerar como un bien pri-vativo suyo, por lo que “estaba en su pleno derecho de dis-poner de ese bien según sus deseos sin crédito alguno a la Sociedad Legal de Gananciales ... ni a la Comunidad de Bienes Posdivorcio ...”.(4) Además, aprovechó la alegación para llevar a la atención del tribunal que el propio señor Roselló Puig admitió en su escrito el carácter privativo del bien, por lo que solicitó que esa expresión se considerara como una “admisión de parte” sobre la naturaleza priva-tiva del inmueble. En fin, la señora Rodríguez Cruz le so-licitó al tribunal primario que dictara sentencia sumaria a su favor, puesto que entendía que la existencia de la escri-tura “Warranty Deed” hacía incontrovertible la naturaleza privativa del inmueble.
*89 El Tribunal de Primera Instancia acogió la solicitud y dictó una sentencia sumaria parcial. (5) Concluyó que el se-ñor Roselló Puig le había transferido a su exesposa la titu-laridad exclusiva del inmueble mediante el “Warranty Deed”. Determinó que según las leyes del estado de Florida, donde se permite la contratación entre cónyuges, ese negocio jurídico fue válido. Explicó que las leyes de esa jurisdicción eran las que aplicaban a la controversia en vista de que los Arts. 10 y 11 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 10 — 11, establecen que las leyes apli-cables a los bienes inmuebles y a los contratos que los afec-tan son las del lugar donde está sita la propiedad inmueble. A base de lo anterior, dictaminó que el bien in-mueble era privativo de la señora Rodríguez Cruz, por lo que no procedía la consignación del producto de su venta, ya que quedaba excluido de los procedimientos de división de la comunidad.
Insatisfecho con ese dictamen, el señor Roselló Puig acudió mediante un recurso de certiorari al Tribunal de Apelaciones. Adujo que el foro primario había errado al determinar que la prohibición de contratación entre cónyu-ges —establecida en los Arts. 1286 y 1347 del Código Civil de Puerto Rico, 31 L.P.R.A. sees. 3588 y 3772— no aplica cuando el negocio jurídico versa sobre la compraventa de un bien inmueble sito en el estado de Florida. Expuso que esa decisión es contraria al estado de derecho vigente, pues éste “reconoce la unicidad del patrimonio matrimonial, sin distinción entre bienes muebles e inmuebles cuando se trata de conflictos entre los cónyuges exclusivamente (sin afectar terceras personas)”. (6)
Además, alegó que realmente “nunca fue la intención de las partes hacer una donación o venta entre marido y mu- *90 jer” (énfasis suprimido),(7) sino que otras consideraciones lo llevaron a suscribir tal contrato.(8) No obstante, a pesar de esa alegación, lo que solicitó fue que se revocara al foro primario para que se estableciese “que las donaciones o compraventa recíprocas entre marido y mujer est[á]n proh[i]bidas a[u]n cuando el bien inmueble adquirido por dicha Sociedad Legal de Gananciales est[á] fuera de la ju-risdicción de Puerto Rico”.(9)
El Tribunal de Apelaciones acogió el recurso y revocó el dictamen del foro primario. Concluyó que
[l]a cesión o transferencia simulada que realizó el señor Ro-selló a la señora Rodríguez no cambió la naturaleza ganancial del inmueble, porque en Puerto Rico, vigente el matrimonio, los cónyuges no pueden alterar la naturaleza del bien, aunque estuviera ubicado en otro país o estado, la sociedad no puede donar ni vender el bien a uno de los cónyuges, ni éstos dispo-ner de su participación ganancial para favorecer a uno solo de ellos.(10)
Para concluir lo anterior, el foro recurrido se funda-mentó en que, aun cuando la ley del estado de Florida per-mite la adquisición de un bien ganancial por uno de los cónyuges, su aplicación en Puerto Rico implicaría trastocar sustancialmente nuestra norma de derecho civil que pro-híbe a los cónyuges realizar contratos y donaciones entre sí.
A base de lo anterior, el tribunal a quo determinó que, en vista de lo expresado en Toppel v. Toppel, 114 D.P.R. 775 *91 (1983), no aplicaba a los hechos del caso de autos el Art. 10 del Código Civil de Puerto Rico, supra,(11) sino que aplicaba el Art. 11, supra, en su modalidad de efecto atenuado.(12) De esta forma, dispuso que el bien inmueble sito en el es-tado de Florida era ganancial, pues "[ajunque el traspaso a la señora Rodríguez y la venta subsiguiente del inmueble a un tercero fueran válidas según las leyes de Florida, el bien nunca salió idealmente del patrimonio ganancial, por-que no podía salir, por donación ni compraventa, para in-tegrarse al patrimonio de uno solo de los cónyuges”. (Enfa-sis suprimido.)(13)
Ahora bien, como aplicó esa disposición estatutaria en su modalidad de efecto atenuado, el foro apelativo interme-dio reconoció, al amparo de las leyes del estado de Florida y para propósitos de la titularidad actual, la validez y la eficacia de la enajenación del bien inmueble realizada por la señora Rodríguez Cruz al tercero adquirente. En conse-cuencia, tras establecer que el dinero recibido de esa com-praventa sustituyó al inmueble en el patrimonio ganan-cial, ordenó al foro primario que lo colacionara como activo ganancial para adjudicarse por la mitad entre ambos excónyuges.
En desacuerdo con el dictamen del Tribunal de Apela-ciones, la señora Rodríguez Cruz acudió ante nuestra consideración. Esencialmente, adujo que había errado el foro recurrido al determinar que la compraventa realizada *92 entre los excónyuges produjo efectos ante terceros pero que, al margen de lo dispuesto en el mencionado Art. 10, ello no tuvo el efecto de transferir el título del bien a su patrimonio. Manifestó que, en vista de que el bien inmue-ble estaba sito en el estado de Florida, incidió ese foro al obviar la figura de lex rei sitae codificada en ese artículo, contraviniendo así las doctrinas de conflicto de leyes, de entera fe y crédito, y de igual protección de las leyes.
En cuanto a la doctrina de entera fe y crédito, expresó que el Tribunal de Apelaciones dictaminó incorrectamente al no reconocer la efectividad de las leyes del estado de Florida, en relación con un negocio jurídico efectuado se-gún las leyes de ese estado sobre un bien inmueble sito allí. Sobre la igual protección de las leyes, señaló que estaba en desacuerdo con que ese foro apelativo aplicara de manera diferente las leyes del estado de Florida y de Puerto Rico a la señora Rodríguez Cruz y al tercero adquirente, conce-diéndole a este derechos que a ella le negó.
En atención a estas alegaciones, el 26 de enero de 2007 expedimos el auto solicitado. Ambas partes han comparecido. Procedemos a resolver.
II
 El alcance jurídico del matrimonio es bidimensio-nal: surte efectos personales y patrimoniales. En el plano personal, el enlace de los consortes hace que estos se deban mutuamente la cohabitación, la fidelidad, el socorro y la protección.(14)
Por otro lado, al contraer nupcias, los cónyuges también configuran el régimen patrimonial que regirá su matrimo-nio; régimen de bienes, de deberes y derechos patrimoniales. La constitución de ese régimen puede reali-zarse mediante el otorgamiento previo de un contrato de *93 capitulaciones matrimoniales(15) No obstante, ante la au-sencia de pacto o la insuficiencia de esas capitulaciones matrimoniales, nuestro Código Civil establece que el régi-men económico que regirá el matrimonio será la Sociedad Legal de Bienes Gananciales(16)
La existencia del régimen de la Sociedad Legal de Bienes Gananciales implica que los cónyuges son condueños y coadministradores de la totalidad del patrimonio matrimonial, por lo que ostentan la titularidad conjunta de este sin distinción de cuotas(17) Por esta razón, independientemente de que se adquieran para uno solo de los consortes(18) “[s]e reputan gananciales todos los bienes del matrimonio, mientras no se pruebe que pertenecen privativamente al marido o a la mujer”(19) De igual manera, todas las deudas y obligaciones del matrimonio se reputan gananciales a me-nos que se demuestre lo contrario(20)
En vista de lo anterior, tras la disolución del matrimonio, cuestión que provoca ipso facto la extinción de la Sociedad Legal de Bienes Gananciales, los exconsortes “harán suyos por mitad ... las ganancias o beneficios obtenidos indistintamente por cualquiera de los [ex] cónyuges durante el mismo matrimonio”(21) Y es que “[e]l divorcio lleva consigo la ruptura completa del vínculo matrimonial y la separación de propiedad y bienes de todas clases entre los cónyuges”(22) No obstante, en la práctica, la liquidación de *94 los bienes comunes no se produce necesariamente de ma-nera contemporánea al divorcio, sino que tras decretarse disuelta la Sociedad Legal de Bienes Gananciales, surge una comunidad de bienes ordinaria entre los excónyuges.(23)
El patrimonio que conforma esta comunidad de bienes, conocida como “comunidad posganancial”, consta de los bienes que fueron gananciales, cuya titularidad pertenece a ambos excónyuges. Así, pues, esta se mantiene indivisa hasta que se procede con la liquidación de la sociedad de bienes gananciales. Por ello, al momento de pro-ceder con la liquidación de esa sociedad, se requiere realizar un inventario actualizado sobre los activos y pasivos acumulados.(24)
El inventario actualizado es requerido puesto que, cuando esta operación se pospone, el monto de los activos y pasivos puede variar debido a los posibles cambios y ope-raciones que hayan acaecido con relación al caudal común. Por eso hemos establecido que “en la adjudicación final de la participación que le corresponde a cada ex cónyuge, debe tomarse en consideración, de acuerdo con la evidencia so-metida, si uno de los ex cónyuges puede interponer frente al otro un crédito por los cambios y las operaciones que ocurrieron en el haber común”. (Enfasis suprimido.(25)
Por ejemplo, ese es el caso en que, vigente la comunidad posganancial, uno de los excónyuges adquiere para sí otros bienes con fondos comunes. Ante esa situación, habiéndose disuelto la sociedad de gananciales, el bien le pertenece de manera privativa a ese comunero, ello “sin perjuicio del ‘crédito a favor de la comunidad postganancial por el im-porte actualizado de los fondos comunes utilizados’ ”.(26) En *95 este sentido, no surte efectos la figura de subrogación real debido a la inexistencia de la sociedad ganancial.(27)
Ahora bien, ¿qué figura opera cuando unos cónyuges so-metidos al régimen de la Sociedad Legal de Bienes Ganan-ciales adquieren un bien inmueble en una jurisdicción donde se permite la contratación entre estos y, transcu-rrido algún tiempo, optan por transferir la titularidad de este a uno solo de los consortes según lo permiten las leyes de la jurisdicción en que el inmueble está sito? Esta situa-ción contrapone disposiciones estatutarias contenidas en nuestro Código Civil. Delineemos, pues, la normativa aplicable.
III
De entrada, téngase en cuenta que nuestro ordenamiento jurídico prohíbe la contratación entre cónyuges sujetos al régimen de la Sociedad Legal de Bienes Gananciales, con excepción de los convenios permitidos en las capitulaciones matrimoniales y los contratos de mandato otorgados para delegar en uno de los cónyuges la administración o disposición de bienes comunes(28)
Asimismo, tampoco podrán los consortes “venderse bie-nes recíprocamente, sino cuando se hubiese pactado la se-paración de bienes, o cuando hubiera separación judicial de los mismos bienes”(29) El origen de la normativa que prohíbe la venta recíproca entre cónyuges se ha asociado con el principio de la inmutabilidad del régimen económico matrimonial(30) pues una vez éste ha sido seleccionado, los consortes no pueden alterar la composición de la masa co-mún mediante actos dispositivos entre ellos.
*96 Por otro lado, y al margen de estas excepciones, el Art. 1286 del Código Civil, 31 L.P.R.A. sec. 3588, también prohíbe que los cónyuges se donen bienes durante el matrimonio a no ser que se trate de regalos módicos en ocasión de regocijo familiar. Respecto a la prohibición de donaciones mutuas entre los cónyuges, nos explica el Prof. Raúl Serrano Geyls que esta responde más bien “a la necesidad de evitar influencias, coacciones y abusos que el cónyuge más fuerte podría ejercer sobre el más débil”. (31)
Ahora bien, es menester señalar que el Art. 1286 de nuestro Código Civil, supra, tiene su origen en el Art. 1.334 del Código Civil español. En ese sentido es interesante de-notar que el 13 de mayo de 1981 se suprimieron las limi-taciones al poder de disposición de los cónyuges en el Có-digo Civil español. De hecho, previo a esa eliminación, los comentaristas españoles ya apuntaban que esas prohibi-ciones a las donaciones mutuas entre los consortes eran “prohibiciones que no afecta[ban] el orden público español, por lo que pod[ían] ser desconocidas por un donante extranjero”. (Enfasis suplido.)(32)
En el caso de autos, y como señalamos, la propiedad en controversia fue transferida a la peticionaria por la cantidad de diez dólares, precio que es nominal, pues es evidente que el valor de cualquier inmueble en el estado de Florida excede de manera considerable tal cantidad. En ese sentido es igualmente evidente que nos encontramos ante una donación disimulada o simulación relativa contractual. En Banco Popular v. Registrador, 172 D.P.R. 448, 454-455 (2007), señalamos que la donación disimulada o simulación relativa contractual ocurre
*97 ... cuando los contratantes llevan a cabo un negocio jurídico aparente que encubre otro real con causa lícita, fingido o disimulado. En específico, hemos resuelto que hay una dona-ción disimulada en un contrato de compraventa cuando la causa de dicho contrato no es onerosa, sino que responde a la mera liberalidad de uno de los contratantes, el donante.(33)
IV
La controversia que tenemos ante nuestra consideración nos obliga a adentrarnos en materia de derecho internacional privado, ya que fue en el estado de Florida —cuyas leyes permiten la contratación entre los consortes— donde los excónyuges suscribieron el contrato traslativo de titularidad de un inmueble ganancial sito allí. No obstante, es importante recordar que en materia de “derecho internacional privado se consideran extranjeras entre sí aquellas jurisdicciones con legislación propia sobre determinadas materias, cuyas legislaciones pueden venir en conflicto unas con otras, aunque esas jurisdicciones no sean necesariamente extranjeras a los fines del derecho internacional público”. (Enfasis suplido.(34) Precisamente, ese es el caso de países organizados federalmente, como por ejemplo Estados Unidos de América, en el que las legislaciones de los diferentes estados dan margen a que se generen conflictos de leyes. Esos conflictos suelen encontrar solución en la aplicación de normas o principios del derecho internacional privado.
En cuanto a las relaciones jurídicas que se suscitan en-tre cónyuges, y en el marco del derecho internacional pri-vado, nos comenta Miaja de la Muela lo siguiente:
Una de las cuestiones especiales de mayor trascendencia, dentro de las relaciones entre cónyuges, en Derecho interna- *98 cional privado, es la ley que rige la posibilidad jurídica de contratos de donación, venta o sociedad entre ellos, que unas legislaciones permiten y otras prohíben. Luchan, en este caso particular, como siempre, la ley nacional de los esposos y el Derecho local, con su excepción de orden público, que será o no aplicable según lo riguroso de la prohibición en el respectivo ordenamiento(35)
V
En la actualidad, los problemas que se generan en nues-tra jurisdicción en materia de derecho internacional pri-vado son atendidos por los Arts. 9 (estatuto personal), 31 L.P.R.A. sec. 9, el Art. 10 (estatuto real) y el Art. 11 (esta-tuto formal) del Código Civil de Puerto Rico, supra.
El estatuto personal establece que “[1] as leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal [de] las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros”(36) Es de notar que este estatuto, tal como lo indica su calificativo, surte efectos precisamente sobre la persona, no sobre sus bienes. Por lo tanto, a modo de ejemplo, el Art. 9 del Código Civil, supra, es determinante ante controversias relacionadas con el contenido del matrimonio, del régimen matrimonial y del contrato sobre bienes con ocasión de matrimonio (capitulaciones matrimoniales).
Ahora bien, así como las cuestiones relativas a la eficacia o la nulidad de los actos o contratos que afectan directamente a las personas se regulan por medio del estatuto personal (Art. 9), cuando nos enfrentamos a los asuntos relacionados con los bienes emerge el llamado estatuto real. A esos efectos, el Art. 10 del Código Civil, supra, dis- *99 pone que “[l]os bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos”.(37) Se desprende que, a diferencia del estatuto personal, el estatuto real establece claramente que todo lo referente a los bienes inmuebles se rige por las leyes del lugar donde estén ubicados, “independientemente del domicilio de sus dueños”.(38) Es solo cuando de bienes muebles se trata que corresponde aplicar la ley del domi-cilio del propietario.
En cuanto a este tema, es importante señalar que la incorporación del actual estatuto real como parte del con-junto de normas que rige en esta jurisdicción provino del concepto lex rei sitae, según se concebía en Estados Unidos. A esos efectos, en Bracons v. Registrador de San Juan, 24 D.P.R. 753, 757 (1917), esta Curia catalogó tal proceder como la reforma más importante del “Título Preliminar del Código Civil”, al citar con autoridad a la Comisión Codifi-cadora de 1902, en el sentido de que:
“La reforma más importante hecha en el Título Preliminar del Código ha sido la relativa a restringir la doctrina de los esta-tutos personal y real, tomando en cuenta y aplicando el prin-cipio general del derecho civil americano de que los derechos respecto a los bienes inmuebles han de regularse totalmente, así en cuanto a la contratación como en cuanto a los derechos hereditarios, por la ley del país en que están sitos.” (Enfasis suplido.)(39)
La razón de ser de la norma establecida en el estatuto real, según ha sido aplicada en Estados Unidos, es descrita de la manera siguiente por el Prof. Raleigh C. Minor en su tratado sobre Conflicto de las Leyes:
"... Cada Estado hace lo que está a su alcance con el fin de que sus leyes que afectan a la entrega, traspaso y gravamen de *100 bienes inmuebles situados dentro de sus límites sean lo más terminantes y precisas posibles. Se exigen formalidades espe-ciales que no se requieren en otras cuestiones. Y es suma-mente importante que las inscripciones legales de dichas tran-sacciones, las cuales constituyen series de títulos a los bienes inmuebles, se conserven libres de toda censura, irregularidad o confusión con los requisitos de otros Estados.
“Por tanto, viene a ser especialmente parte de la política de todo Estado el no permitir que se verifique ninguna transac-ción relativa al traspaso de cualquier derecho o título a la propiedad inmueble que radica en dicho Estado si con ello se infringe su propia ley ya sea o n[o] v[á]lida de acuerdo con la leyes de Estados extranjeros. ...
“Ni pretenderán las cortes de otros Estados hacer valer sus propias leyes relativas a los bienes inmuebles situados en otras partes, no solamente por espíritu de cortesía y su repugnancia a observar una conducta hacia otros Estados que no permiti-rán que estos últimos la observaran con ellos mismos, sino también y tal vez principalmente por la absoluta imposibilidad en que se encuentran para dictar cualquier sentencia o decreto que sea definitivo y eficaz para traspasar cualquier derecho sobre el inmueble. Por tanto, en vez de dictar sentencias que son ociosas de conformidad con su misma ley, al considerar el título de los bienes inmuebles radicados en países extranjeros, las cortes tratarán de fijar las reglas establecidas por la lex situs de dichos bienes, y resolverán de acuerdo con esa ley, pues a ella deben acudir las partes en definitiva en todo caso.
“Viene, pues, a ser un principio bien establecido de derecho internacional privado, sostenido por un fuerte núcleo de auto-ridades, que todas las cuestiones relativas a traspasos de títu-los sobre bienes inmuebles donde quiera que surjan se regirán por la lex situs, o sea, por la ley del tribunal en que finalmente deban ser resueltas en definitiva esas cuestiones.” (Enfasis suplido.(40)
Basándose en la explicación otorgada por la Comisión Codificadora que preparó el proyecto del Código Civil de 1902, respecto a la razón por la cual se incorporó el esta-tuto real en nuestro ordenamiento, y tras invocar la opi-nión de tratadistas estudiosos de la materia, esta Curia “trazó su línea de conducta con toda claridad, optando por *101 aplicar a Puerto Rico íntegramente la teoría americana, esto es, que la lex rei sitae es la norma que debe seguirse al determinar la capacidad legal de las partes en transaccio-nes sobre bienes inmuebles”.(41)
Toda cuestión relacionada con los bienes inmuebles se rige por el estatuto real. Esto es, las leyes del lugar donde está sito son las que priman, sin importar el domicilio de su propietario. Un caso ilustrativo de ello es el precedente establecido en Babilonia v. Registrador, 62 D.P.R. 688 (1943). En ese caso, una puertorriqueña estableció su domicilio en el estado de Nueva York y luego contrajo nupcias en ese estado con un puertorriqueño que llevaba varios años domiciliado allí. Al poco tiempo, ambos regresaron a la Isla y posteriormente el marido abandonó a su esposa para regresar nuevamente al estado de Nueva York. Vigente el matrimonio, la esposa compró tres fincas en Aguadilla mediante una escritura en la que hizo constar que era una señora casada con domicilio en el mencionado municipio.
El Registrador de la Propiedad inscribió la escritura con el defecto subsanable de no haber acreditado que el dinero invertido en esa compra era privativo. Luego de transcurrir varios años desde la inscripción, la señora solicitó al Regis-trador de la Propiedad que subsanara el defecto. En particular, adujo que para la época en que se casó ambos tenían su domicilio en el estado de Nueva York, por lo que las leyes de ese estado eran las que regían los bienes inmuebles ad-quiridos con posterioridad a su matrimonio. Por lo tanto, según argumentó la señora Babilonia, al no existir el régi-men económico de la Sociedad Legal de Bienes Gananciales en Nueva York, entonces esos bienes inmuebles adquiridos por ella en matrimonio eran propiedad privativa suya.
*102 Ante esas alegaciones, esta Curia dispuso que aun cuando el matrimonio no se contrajo sujeto al régimen de la Sociedad Legal de Bienes Gananciales, pues esa regla de propiedad matrimonial no opera en el estado de Nueva York, “en cuanto a bienes inmuebles adquiridos con poste-rioridad al matrimonio, no cabe duda de que el estatuto real, y no el personal, es el que rige”. (Énfasis suplido.(42) De este modo, se concluyó que la celebración del matrimo-nio en el estado de Nueva York más el domicilio temporal en ese estado “no son suficientes para justificar tan radical abandono de nuestra regla local sobre derechos de propiedad”.(43) Además, señalamos que “en vista del hecho de que el estatuto real es el que impera, no vemos qué efecto pueda tener el domicilio sobre la cuestión aquí en-vuelta, excepto a los fines ... [de] probar que el dinero con el cual compró los bienes inmuebles en cuestión fu[e] obte-nido por ella mientras estaba domiciliada en Nueva York”.(44)
Lo anterior se conforma íntegramente a la letra del ci-tado Art. 10, esto es, los bienes muebles se rigen por las leyes del domicilio de su propietario, mientras que los bie-nes inmuebles están sujetos a las normas del lugar en que se encuentran. Además, esa doctrina pautada jurispruden-cialmente es cónsona con lo establecido por el 2 Restatement of the Law (Conflicts of Laws) 2d Sec. 234 (1971), el cual formula que el efecto que tendrá el matrimonio sobre los bienes inmuebles adquiridos durante la vigencia del consorcio será determinado por el derecho que apliquen los tribunales donde esté ubicada la propiedad, el cual —tal *103 como ha resuelto este Tribunal en reiteradas ocasiones— usualmente será el suyo.
Ahora bien, a pesar de que la letra clara del estatuto real había sido aplicada de forma consistente, en Toppel v. Toppel, 114 D.P.R. 775 (1983), esta Curia optó por variar la doctrina establecida. Al así hacerlo razonamos que, consi-derando que el Art. 10 de nuestro Código Civil, supra, en-contraba su raíz y equivalente en el Código Civil español, y debido a que para ese tiempo en España no existía el divorcio, el estatuto real “no se diseñó para resolver los con-flictos de leyes en la zona del régimen de los bienes matrimoniales”. (45) Reexaminado ese razonamiento, nos percatamos de que este fue errado.(46) Veamos.
Como reseñamos, desde Bracons v. Registrador de San Juan, supra, citando a la Comisión Codificadora del Código Civil de 1902, la reforma legislativa relativa al alcance del Art. 10, supra, se había catalogado como la más impor-tante del Título Preliminar del Código Civil. Esto, al incor-porarse el principio general del derecho estadounidense respecto a que los bienes inmuebles se regulan totalmente por la ley del lugar donde estén sitos. Ante esa realidad y conforme a la clara intención del legislador, lo que corres-pondía entonces en Toppel v. Toppel, supra, era analizar el alcance que se le había otorgado a la figura de lex rei sitae en el derecho estadounidense.
De manera que, aunque el texto original del Art. 10 del Código Civil, supra, proviniera en un principio del Código español, en Toppel v. Toppel, supra, debimos interpretar el artículo a la luz de la nueva realidad puertorriqueña que esbozó nuestra Asamblea Legislativa en 1902. En ese'sen-tido, por ser contrario al historial del Código Civil de *104 Puerto Rico, consideramos desacertado haber modificado la doctrina reiterada consistentemente(47)
Cónsono con lo anterior, en Zarelli v. Registrador, 124 D.P.R. 543 (1989), caso posterior a Toppel v. Toppel, supra, este Tribunal obvió la mencionada modificación al aplicar nuevamente el estatuto real para resolver una cuestión re-lacionada a la enajenación de bienes inmuebles ganancia-les, entiéndase, en la zona del régimen de bienes gananciales. En específico, la controversia que se presentó fue si un poder general otorgado en Estados Unidos por un cónyuge a favor de otro constituye el mandato expreso y requerido en Puerto Rico para la enajenación de los bienes inmuebles gananciales. Al resolver que, según el Art. 10 del Código Civil, supra, la ley aplicable era la de Puerto Rico, expresamos:
Aun cuando la señora Salemi no estuviese domiciliada aquí y fuera solamente residente de la isla, el resultado sería el mismo. Tendríamos que aplicar las leyes locales porque el in-mueble está sito aquí. El estatuto real aplica a todos los in-muebles sitos en la isla, independientemente del domicilio de ' sus dueños. De manera que no existe controversia alguna de que las leyes de Puerto Rico son las aplicables al considerar la disposición del referido inmueble. (Citas omitidas.(48)
Desde esta perspectiva, como el Art. 10 del Código Civil, supra, incorporó el principio general del derecho estado- *105 unidense respecto a que los bienes inmuebles se regulan totalmente por la ley del lugar en el que estén sitos, lo correcto entonces es identificar cómo ha sido su desarrollo en aquella jurisdicción. A manera de ejemplo, la figura lex rei sitae ha sido aplicada de la siguiente forma en Estados Unidos de América, ello con influencia del derecho civil en cuanto a los efectos del matrimonio:
Marriage is a very personal matter, and its incidents are general regulated by the law of the matrimonial domicile. But the Spanish and French laws touching community property, and those of California and Texas and other States derived from them, are held to be, in the vocabulary of the civilians, statutes real and not statutes personal; that is to say, they apply to things within a country’s jurisdiction rather than to persons wherever they may be or go. It should follow that things, whether movable or immovable, actually situated in a State and effectively within its power, should be governed by the law of the State. It is universally held that real or immovable property is exclusively subject to the law of the country or State in which it is situated, and no interference with it by the law of any other sovereignty is permitted. And the question whether property is real or personal is to be solved by the law of the place where it is actually located. These rules apply to questions of the marital rights of spouses in property. (Enfa-sis suplido y citas omitidas.)(49)
Como vemos, en el derecho estadounidense se le da gran énfasis al hecho de que la propiedad inmueble se rige única y exclusivamente por las leyes del estado en que esté sito el inmueble. Ello evita que surjan conflictos entre estados hermanos en relación con la ley que deba aplicarse res-pecto a las propiedades inmuebles sitas en éstos. Además, propicia un ambiente de mutua deferencia respecto al do-minio y la soberanía de estos sobre el bien en cuestión, a la vez que promulga la aplicación uniforme de las leyes a to-das las propiedades inmuebles en un mismo territorio. A su vez, introduce un alto grado de previsibilidad, al mismo *106 tiempo que refleja el control que el estado puede ejercer sobre los bienes que se encuentran en su territorio. Es claro que el estado en el que está ubicado el inmueble po-see un interés particular sobre este en vista de que preci-samente esa propiedad es inamovible.
La confirmación de que esta visión es la que prevalece en el derecho estadounidense en materia de conflicto de leyes la provee el Restatement of the Law:
Several factors serve to explain the importance attributed by the rule to the location of the land. The state where the land is situated will have a natural interest in transactions affecting it, particularly in view of the fact that land by its nature is immovable. Also, since in the situations covered by the rule the land constitutes the subject matter of the contract, it can often be assumed that the parties, to the extend that they thought about the matter at all, would expect that the local law of state where the land is situated would be applied to determine many of the issues arising under the contract. The rule furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the state where the land is situated will be readily ascertainable, of ease in the determination of the applicable law.(50)
Incluso, como previamente hemos expuesto, ello es apli-cable a las controversias surgidas respecto a los derechos propietarios de los cónyuges en la zona del régimen econó-mico matrimonial. Así se protegen las expectativas para las cuales los cónyuges contrataron según las leyes que rigen la propiedad inmueble en cuestión. Todo esto es compatible con lo establecido de manera reiterada por esta Curia, pues, como ha quedado demostrado, al enfrentarse a controver-sias sobre bienes inmuebles sitos en Puerto Rico, las leyes de esta jurisdicción han primado consistentemente.
*107 VI
En cuanto a las cuestiones de cambio de domicilio conyugal, nuestra Asamblea Legislativa dispuso en el Art. 1277 del Código Civil, 31 L.P.R.A. sec. 3561, la norma aplicable al caso específico en que se contrae matrimonio en el extranjero y solo uno de los cónyuges es puertorriqueño, pero los consortes no establecen el régimen económico que regirá su matrimonio con relación a sus bienes. Ante ese escenario, la Legislatura estableció que “se entenderá que se casan bajo el régimen de la ley del país en el cual los contratantes establezcan su domicilio conyugal, tomando en cuenta otros factores que en justicia deban considerarse, tales como conflicto móvil o centro de intereses conyugales, todo sin perjuicio de lo establecido en este título respecto a los bienes inmuebles”. (Enfasis suplido.(51)
La citada disposición estatutaria adopta los postulados establecidos por este Tribunal en Toppel v. Toppel, supra, respecto a los asuntos generados a partir de la situación conocida en el derecho internacional privado como conflicto móvil,(52) pero en su última parte le devuelve su plena efi-cacia al Art. 10 del Código Civil, supra, en cuestiones rela-cionadas con la zona del régimen económico matrimonial. Y es que la doctrina sobre el conflicto móvil o centro de intereses conyugales establecida en esa decisión fue incor-porada por el legislador en 1987 al enmendar el Art. 1277 del Código Civil, supra, pero ello “sin peijuicio de lo esta-blecido [en el Art. 10] respecto a los bienes inmuebles”.(53) Con esta última expresión, la Asamblea Legislativa re-chazó directamente la interpretación que del Art. 10 del *108 Código Civil, supra, se realizó en Toppel v. Toppel, supra, a los efectos de que el estatuto real “no se diseñó para resolver los conflictos de leyes en la zona del régimen de los bienes matrimoniales”.(54) Ello implica, además, que para cuestiones como las de autos, el legislador rechazó la regla de unicidad patrimonial, con excepción de la situación es-pecífica acaecida en Toppel v. Toppel, supra, esto es, los matrimonios contraídos en el extranjero en los que ambos cónyuges sean extranjeros y se determine que el centro de intereses del matrimonio es en Puerto Rico, y si tanto los bienes muebles como los inmuebles están ubicados aquí.
Respecto a este particular, resulta muy atinado el aná-lisis que realiza el ex Juez Asociado Raúl Serrano Geyls en su tratado Derecho de familia de Puerto Rico y legislación comparada:

... La regla de la unicidad patrimonial, rechazada en el art. 1277 del C.C. al quedar expresamente vigente la aplicabilidad del art. 10 del mismo en cuanto a los bienes inmuebles, podría prevalecer sólo en los casos de matrimonios contraídos fuera de P.R. en los que ambos cónyuges sean extranjeros y se determine que el centro de intereses del matrimonio es P.R., y si, como en el caso Toppel, tanto los bienes muebles como los inmuebles están en P.R., al momento del divorcio. Sería imposible alcan-zar con nuestra ley bienes extranjeros más allá de nuestras fronteras, salvo que el país concernido acepte la determinación de los tribunales puertorriqueños.

Posiblemente la idea más innovadora adoptada en el art. 1277 del C.C. fue la de la mutabilidad limitada que permite, en casos donde no se hayan otorgado capitulaciones matrimo-niales, un cambio de régimen económico luego de celebrado el matrimonio si se justificare el cambio a la luz de los criterios de Toppel y lo establecido en ese artículo. Este concepto de la mutabilidad limitada fue resultado de la doctrina de la vo-luntad presunta reconocida en el Derecho Internacional Priva-do. ... Entendemos que este art. 1277, tanto antes de ser en-mendado como luego de la enmienda vigente, no es de aplicación a matrimonios en que son extranjeros ambos cón-yuges, en cuyo caso, como ya dijimos, habrá de regir lo re- *109 suelto en Toppel aplicando la regla de la unicidad patrimonial sólo en circunstancias idénticas a las que se dieron allí. No obstante, como el nuevo art. 1277 reafirma el principio básico del art. 10 sobre bienes inmuebles, podría interpretarse que ello se aplica a todas las situaciones. (Enfasis suplido.(55)
Ciertamente, mediante el Art. 1277 del Código Civil, supra, el legislador puertorriqueño alteró dos principios com-prendidos en la zona del régimen de bienes gananciales: la unicidad patrimonial y la inmutabilidad del régimen eco-nómico matrimonial. En cuanto al primero, al reiterar la aplicación del Art. 10 del Código Civil, supra, se provee para que los bienes inmuebles se rijan según las leyes del país en que estén sitos, al margen del régimen económico que rige la relación patrimonial de los consortes. De otro lado, la regla de inmutabilidad del régimen económico dejó de ser absoluta. Esto es, la Asamblea Legislativa adentró en nuestro ordenamiento la mutabilidad limitada en casos en los que no se hayan otorgado capitulaciones matrimo-niales y sí se justifica su aplicación según los criterios es-tablecidos en el Art. 1277 del Código Civil, supra, teniendo en cuenta los factores identificados en Toppel v. Toppel, supra. Ello, como consecuencia del reconocimiento por parte del legislador de la aplicación en Puerto Rico de la doctrina de la voluntad presunta, la cual —en palabras de la propia Legislatura— “reconoce la autonomía de un na-cional para contratar sobre bienes con ocasión del matri-monio, conservando la libertad durante el curso de su vida para adquirir nuevo domicilio y adoptar sus costumbres, su forma de vida y sus prácticas de negocios, viniendo eventualmente por elección a ser sujeto de un estatuto personal distinto al que le dio su origen”.(56)
*110 VII
En Rojas, Randal & Co. v. El Registrador, 27 D.P.R. 21 (1919), citando a Colón et al. v. El Registrador, 22 D.P.R. 369 (1915), y a Bracons v. Registrador de San Juan, supra, establecimos que, conforme al estatuto real, para decretar la validez de un contrato cuyo objeto sea un bien inmueble, basta con identificar que se haya cumplido con los requisi-tos internos o esenciales —como la capacidad legal de las partes— dispuestos para esos convenios por las leyes del país en que esté sito el inmueble.
Es necesario, pues, distinguir entre lo que son los requisitos de fondo o intrínsecos y los requisitos formales. Las cuestiones de fondo son aquellas a las que nos hemos referido antes respecto a los requisitos internos o esenciales de los convenios sobre bienes inmuebles. Por otro lado, los requisitos formales de esos contratos están regidos por el estatuto formal, consagrado en el Art. 11 del Código Civil, supra. La regla establecida por ese estatuto se le conoce como locus regit actum (el lugar rige el acto) o lex loci actus (la ley del lugar de los actos), la cual dispone “el principio de que en el otorgamiento de un acto o contrato en una jurisdicción extranjera las partes deben cumplir con todas las formas y solemnidades exigidas por las leyes de ese lugar”.(57) La existencia de esta norma se debe a que es a ella que se recurre cuando surgen conflictos sobre contratos formales o solemnes; esto es, si la solemnidad requerida es la del foro extranjero o la del patrio.
Precisamente, en Armstrong v. Armstrong, 85 D.P.R. 404 (1962), este Tribunal se enfrentó a un testamento otor-gado fuera de Puerto Rico acorde con las formas y solem-nidades del lugar donde se otorgó, pero con la particulari-dad de que mediante éste se transmitían derechos sobre *111 bienes inmuebles sitos en esta jurisdicción. Como vemos, la controversia versó sobre requisitos formales del documento y no de fondo o intrínsecos, pues no se planteó que lo dis-puesto en el testamento contravenía nuestro derecho sus-tantivo en materia de sucesiones. Habiendo sido de exclu-siva competencia el estatuto formal, esta Curia determinó que en Puerto Rico no es necesario que un testamento otor-gado en el extranjero cumpla con los requisitos formales que exige nuestra ley, aun cuando mediante ese testa-mento se transmitan derechos sobre bienes inmuebles si-tos aquí.
Ahora bien, el estatuto formal, cuyas disposiciones son de naturaleza potestativa o discrecional, no imperativas o mandatorias,(58) contiene una disposición que, aunque nada tiene que ver con las formas, crea una regla excepcional. En específico, el Art. 11 del Código Civil, supra, establece lo siguiente:
Las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, se rigen por las leyes del país en que se otorguen.
No obstante lo dispuesto en esta sección y en la anterior, las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las bue-nas costumbres, no quedarán sin efecto por leyes o sentencias dictadas, ni por disposiciones o convenciones acordadas en países extranjeros.(59)
Nótese que a pesar de que el estatuto formal solo aplica a actos jurídicos en los que la forma es lo que importa, el legislador puertorriqueño optó por incluir en éste una norma limitativa de las actuaciones que realizan las per-sonas en el extranjero.
*112 VIII
El caso de autos presenta una situación muy particular en la que se enfrentan dos disposiciones del Código Civil en materia de derecho internacional privado; una que intenta sobreponerse a la otra al anular expresamente sus efectos ante actos prohibidos por nuestras leyes. En otras pala-bras, tenemos aquí la norma limitativa del estatuto formal (Art. 11 del Código Civil, supra) que se impone ante la sostenida figura de lex rei sitae del estatuto real (Art. 10 del Código Civil, supra). Ello a pesar del gran énfasis que esta última ha adquirido en el derecho estadounidense —de donde proviene— a los efectos de que la propiedad inmueble se rige única y exclusivamente por las leyes del estado donde está sita. Ello es reflejo del control que el estado puede ejercer sobre los bienes inamovibles que se encuentran en su territorio.
Queda claro que la transacción realizada entre la señora Rodríguez Cruz y el señor Roselló Puig, al transferir a la primera la titularidad exclusiva del inmueble sito en el es-tado de Florida, según las leyes de ese estado, fue una ac-tuación que no podría efectuarse en nuestra jurisdicción. Recuérdese que en Puerto Rico, unos cónyuges sujetos al régimen de la Sociedad Legal de Bienes Gananciales no pueden contratar entre sí ni realizarse donaciones más allá de aquellas módicas en ocasión de regocijo familiar. Ad-quiere relevancia, entonces, la regla prohibitiva del Art. 11 del Código Civil, supra, la cual dicta que a pesar de lo que una ley de un país extranjero disponga, en Puerto Rico no tendrá efecto si aquí se prohíbe realizar tal acto. Lo anterior, ante situaciones como la presente, tiene el efecto de limitar el alcance de la reforma más importante hecha en el Título Preliminar del Código Civil en cuanto a “ ‘que los derechos respecto a los bienes inmuebles han de regularse total-mente, así en cuanto a la contratación como en cuanto a *113 los derechos hereditarios, por la ley del país en que están sitos’ (Énfasis suplido.(60)
Ahora bien, el caso de autos presenta otro asunto muy particular. Específicamente se trata de la realidad de que el negocio jurídico del cual el inmueble en cuestión es ob-jeto se realizó, no en un país extranjero, sino en y conforme a las leyes de un estado de Estados Unidos de América, cuyo sistema federado integra a Puerto Rico como componente. Esta indudable realidad nos obliga a plan-tearnos si obviar la actuación de la peticionaria con el re-currido, realizada conforme a las leyes del estado de Florida, no es violatoria de la cláusula de entera fe y crédito del Art. IV, Sec. 1 de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, que también rige en nuestra jurisdicción. Téngase en cuenta que estamos ante un conflicto de leyes entre dos jurisdicciones de un mismo sistema federal.
Las leyes de un estado de Estados Unidos de América no son estatutos ajenos a nuestro ordenamiento jurídico. Todo lo contrario, en Estados Unidos de América existen salva-guardas constitucionales que se extienden a Puerto Rico, como lo son las cláusulas de debido proceso de ley y de entera fe y crédito, las cuales dan certeza de la justicia de las actuaciones oficiales en cada uno de los estados.(61) Esas salvaguardas impiden que tratemos las leyes del es-tado de Florida como unas normas extrañas. Insistir en así hacerlo implicaría aislarnos de una comunidad jurídica de la que somos parte, abandonando de esa forma “la cohesión interna [que existe] entre las distintas jurisdicciones que interrelacionan en los Estados Unidos”.(62)
De esta forma, en nuestro sistema federalista sería un contrasentido afirmar que una ley de un estado, por ser *114 distinta a la nuestra (al permitir realizar una transacción respecto a un bien inmueble), es inaplicable en Puerto Rico. Nótese que la prohibición en cuestión no surge del estatuto personal (Art. 9 del Código Civil, supra), sino que al ser un asunto relativo a un bien inmueble, entonces el estatuto real (Art. 10 del Código Civil, supra) es el que aplica, obligándonos así y de primera intención a imple-mentar la ley concerniente al estado de Florida. No obs-tante, lo cierto es que chocamos con la regla excepcional del estatuto formal (Art. 11 del Código Civil, supra), que im-pide en este caso la aplicación del Art. 10 del Código Civil, supra, por ser la ley del estado de Florida distinta a nues-tra ley.
Ahora bien, siendo las leyes del estado de Florida las que el Art. 11 del Código Civil, supra, nos obliga a obviar, este provoca que al aplicar tal norma excepcional se entre en un claro conflicto con una disposición de la más alta jerarquía: la cláusula constitucional de entera fe y crédito. Sabido es que cuando único podemos apartarnos del cumplimiento con la cláusula constitucional federal de entera fe y crédito e ignorar lo que proveen las leyes de otro estado, es cuando respetar la Ley Suprema federal implica darle entera fe y crédito a una ley que tiene el efecto de contrariar el orden público local. Esto es, que esa ley estatal sea repugnante a los valores y a la moral establecidos en nuestra jurisdicción o que provoque disturbios o afecte la organización social, económica o political(63) Ello en vista de que, como señalamos, no estamos ante una sentencia o ley de un país ajeno al nuestro, sino que estamos ante un estatuto de un estado de Estados Unidos de América, al cual le debemos entera fe y crédito.
Como se expuso, la prohibición de contratación entre cónyuges, vigente en nuestro ordenamiento, se ha asociado *115 con el principio de la inmutabilidad del régimen económico matrimonial, a la vez que responde “a la necesidad de evi-tar influencias, coacciones y abusos que el cónyuge más fuerte podría ejercer sobre el más débil”.(64) Ante estas con-cepciones en las que se fundamenta la prohibición de con-tratación conyugal, nos corresponde identificar si apartar-nos de esta limitación para darle entera fe y crédito a la ley del estado de Florida, obviando así la norma excepcional del estatuto formal, pero reconociendo todos los efectos de la figura lex rei sitae, conlleva alterar nuestro orden público.
Como ya hemos reconocido, esta inmutabilidad ha de-jado de ser absoluta, pues —en reacción al dictamen de Toppel v. Toppel, supra— la Asamblea Legislativa en-mendó el Art. 1277 del Código Civil, supra. Al así proceder, el legislador introdujo en nuestro ordenamiento jurídico la mutabilidad limitada del régimen económico matrimonial en casos en los que no se hayan otorgado capitulaciones matrimoniales y se justificase su aplicación al tomar en cuenta “factores que en justicia deban considerarse, tales como conflicto móvil o centro de intereses conyugales, todo sin perjuicio de lo establecido en [el Art. 10] respecto a los bienes inmuebles”.(65)
Como es de notar, el propio legislador ha adentrado en nuestro ordenamiento la noción de la mutabilidad limitada del régimen económico matrimonial. De esta forma, re-sulta forzoso concluir que la inmutabilidad de este régimen no es una norma inquebrantable en Puerto Rico. En este sentido, su concepción tampoco puede ser catalogada como una cuestión arraigada y promulgadora del orden público *116 local, ya que aquí se han preceptuado circunstancias en las que tal inmutabilidad es desatendida. En específico, el le-gislador, al aprobar la versión vigente del Art. 1277 del Código Civil, supra, ha determinado que la norma que es-tablece que los bienes inmuebles se rigen por la ley del lugar donde están sitos funge como una excepción a la in-mutabilidad del régimen económico matrimonial. Abase de lo anterior, no albergamos duda alguna respecto a que el precepto que incorpora esa inmutabilidad —el Art. 1272 del Código Civil, supra— tampoco alcanza el rango necesa-rio como para sobreponerse a la cláusula de entera fe y crédito.
Como puede notarse, tal como apuntaban los comentaris-tas españoles respecto a las donaciones mutuas entre los cónyuges cuando estas estaban prohibidas en el Código Civil español,(66) esas prohibiciones no atentan contra el orden público local, por lo que pueden ser obviadas ante situacio-nes meritorias como la de autos. Más aún cuando respetar la ley del estado de Florida —según la cláusula de entera fe y crédito— a lo que nos conduce es precisamente a sobrepo-ner nuestro estatuto real (Art. 10 de Código Civil, supra), que establece que prevalecerá la ley del sitio donde esté el inmueble, aunque esa ley sea distinta a la puertorriqueña. Disposición que, al regir “totalmente” los asuntos relaciona-dos con los bienes inmuebles, aplica a cuestiones surgidas en la zona del régimen económico matrimonial.
En fin, como la propiedad está sita en el estado de Florida y las leyes de ese estado permiten que los cónyuges alcancen acuerdos o contraten sobre sus bienes, nos corres-ponde entonces otorgarle entera fe y crédito a esas leyes y así validar la transferencia de la titularidad exclusiva del bien inmueble a la señora Rodríguez Cruz.
*117 IX
Ahora bien, a pesar de que resulta forzoso reconocer el carácter privativo de la propiedad sita en el estado de Florida, no debe perderse de vista que el Art. 10 del Código Civil, supra, también establece que los bienes muebles es-tán sujetos a la ley del domicilio de su propietario. De esta forma, la cuestión de quién figura como dueño de la propie-dad inmueble debe resolverse según las leyes del estado de Florida por éste poseer el mayor interés respecto a ese asunto; pero, de los cónyuges haber estado domiciliados en Puerto Rico, las leyes locales gobernarían el asunto concer-niente al crédito que corresponda por el dinero utilizado para la adquisición y posterior pago de la deuda hipoteca-ria de ese inmueble.(67) No obstante, en el supuesto de que haya sido en el estado de Florida donde constituyeron su domicilio conyugal, entonces las leyes de esa jurisdicción serían las aplicables respecto a ese particular.
Sin embargo, los autos no nos aclaran cuál era el domi-cilio de los cónyuges al momento de adquirir la propiedad inmueble y al posteriormente traspasarla a la señora Ro-dríguez Cruz, por lo que no tenemos los elementos de juicio necesarios para adjudicar ese asunto. En ese sentido, le asiste la razón a la peticionaria, la señora Rodríguez Cruz, al aducir en su alegato que erró el Tribunal de Apelaciones al concluir que los consortes estaban domiciliados en Puerto Rico. No encontramos adjudicación alguna sobre el particular por parte del foro primario.
X
Por los fundamentos antes expuestos, determinamos que mediante la escritura otorgada entre las partes en el estado de Florida el inmueble sito en ese estado pasó a ser *118 un bien privativo de la peticionaria. Por lo tanto, se revoca la sentencia dictada por el Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para que, luego de recibir prueba, adjudique cuál fue el domicilio conyugal de los exconsortes y, según las leyes de este, adju-dique la cuantía del crédito correspondiente.(68)

Se dictará sentencia de conformidad.

La Jueza Asociada Señora Fiol Matta emitió una opi-nión disidente, a la cual se unió el Juez Presidente Señor Hernández Denton. La Juez Asociada Señora Rodríguez Rodríguez emitió una opinión disidente. El Juez Asociado Señor Martínez Torres se inhibió.

 La Sec. 708.09 del Florida Statutes establece:

“Sec. 708.09. Married women’s lights; agreements with husband, power of attorney, etc.

“Every married woman may enter into agreements and contracts with her husband, may become the partner of her husband or others, may give a power of attorney to her husband, and may execute powers conferred upon her by her husband, including the power to execute and acknowledge all instruments, including relin-quishments of dower, conveying, transferring, or encumbering property, or any interest in it, owned by her, or by herself and her husband as tenants by the entirety, or by her husband. All powers of attorney heretofore executed by a wife to her husband and vice versa, and the execution of all documents executed thereunder, are hereby validated and confirmed.” http://www.flsenate.gov/Laws/Statutes/2011/708.09

 Apéndice de la Petición de certiorari, pág. 80.

 íd., pág. 85.

 íd., pág. 102.

 A pesar de que el foro primario la tituló “Sentencia Sumaria Parcial”, en realidad era una resolución interlocutoria en la cual se resolvió únicamente la con-troversia relativa al bien inmueble en cuestión.

 Apéndice de la Petición de certiorari, págs. 48-49.

 íd., pág. 47.

 El señor Roselló Puig manifestó que el contrato se suscribió para proteger la propiedad por si en el futuro surgían acreedores suyos, que estos no pudieran ha-cerse con el bien en cobro de la deuda, pues su esposa constaría legalmente como única titular del inmueble. Véase el Apéndice de la Petición de certiorari, pág. 90. Con relación a la naturaleza de esta alegación, ese asunto no se encuentra ante nuestra consideración en este recurso, por lo que corresponderá al foro de instancia atenderlo en su día.

 Apéndice de la Petición de certiorari, pág. 56.

 Sentencia del Tribunal de Apelaciones, Región Judicial de Bayamón, 29 de septiembre de 2006, KLCE200500488, pág. 21. Apéndice de la Petición de certiorari, pág. 23.

 Este precepto legal establece que “[l]os bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos”. Art. 10 del Código Civil, 31 L.P.R.A. sec. 10.

 En lo pertinente, esta disposición estatutaria establece que “las leyes pro-hibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas ... en países extranjeros”. Art. 11 del Código Civil, 31 L.R.R.A. sec. 11.

 Sentencia del Tribunal de Apelaciones, pág. 24. Apéndice de la Petición de certiorari, pág. 26. El Juez Asociado Señor Martínez Torres, quien fuera el Presi-dente del Panel que atendió este pleito en el Tribunal de Apelaciones, concurrió con el resultado del caso, pero discrepó de esta conclusión a la que llegó ese foro. Espe-cíficamente, el Juez Martínez Torres fundamentó su opinión concurrente en un plan-teamiento similar al que esbozamos en esta Opinión.

 Arts. 88 y 89 del Código Civil, 31 L.P.R.A. secs. 281-282.

 Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551. Véase, además, Domínguez Maldonado v. E.L.A., 137 D.P.R. 954, 964 (1995).

 Art. 1267 del Código Civil, supra.

 Montalván v. Rodríguez, 161 D.P.R. 411, 420 (2004).

 Art. 1301 del Código Civil, 31 L.P.R.A. sec. 3641.

 íd.

 Art. 1308 del Código Civil, 31 L.P.R.A. sec. 3661; WRC Props., Inc. v. Santana, 116 D.P.R. 127, 134-135 (1985).

 Art. 1295 del Código Civil, 31 L.P.R.A. sec. 3621.

 Art. 105 del Código Civil, 31 L.P.R.A. sec. 381.

 Montalvo v. Rodríguez, supra, págs. 421-422.

 Art. 1316 del Código Civil, 31 L.P.R.A. sec. 3691.

 Montalvo v. Rodríguez, supra, págs. 422-423.

 íd., pág. 426.

 íd.

 Arts. 91 y 1267 del Código Civil, 31 L.P.R.A. sees. 284 y 3551.

 Art. 1347 del Código Civil, 31 L.P.R.A. sec. 3772.

 Art. 1272 del Código Civil, 31 L.P.R.A. sec. 3556.

 R. Serrano Geyls, Derecho de familia de Puerto Rico y legislación compa-rada, San Juan, Ed. Programa de Educación Jurídica Continua de la U.I.P.R., 1997, Vol. I, pág. 317.

 A. Marín López y otros, Comentarios a las reformas del Código Civil: el nuevo título preliminar del Código y la Ley de 2 de mayo de 1975, Madrid, Ed. Tecnos, 1977, Vol. I, pág. 539.

 Véanse, además: Díaz García v. Aponte Aponte, 125 D.P.R. 1 (1989); La Costa Sampedro v. La Costa Bolívar, 112 D.P.R. 9 (1982); Hernández XJsera v. Srio. de Hacienda, 86 D.P.R. 13 (1962).

 Armstrong v. Armstrong, 85 D.P.R. 404, 409 (1962).

 A. Miaja de la Muela, Derecho Internacional Privado, 9na ed., Madrid, Ed. Atlas, 1982, Vol. 2, pág. 360.

 Art. 9 del Código Civil, 31 L.P.R.A. sec. 9.

 Art. 10 del Código Civil, supra.

 Zarelli v. Registrador, 124 D.P.R. 543, 550 (1989).

 Bracons v. Registrador de San Juan, 24 D.P.R. 753, 757 (1917), citando el Informe de la Comisión Codificadora del Código Civil de 1902, presentado a la Asam-blea Legislativa de Puerto Rico el 31 de diciembre de 1901.

 Según citado en Colón et al. v. El Registrador, 22 D.P.R. 369, 373-374 (1915).

 Bracons v. Registrador de San Juan, supra, pág. 757, interpretando lo re-suelto en Amadeo v. El Registrador, 3 D.P.R. 141 (1903), y en Colón et al. v. El Registrador, supra, respecto a la capacidad de las partes en transacciones sobre los bienes inmuebles.

 Babilonia v. Registrador, 62 D.P.R. 688, 690 (1943). Esta norma fue reite-rada en Pueblo v. Denis Rivera, 98 D.P.R. 704, 714 (1970).

 Babilonia v. Registrador, supra, pág. 692.

 íd., págs. 692-693.

 Toppel v. Toppel, 114 D.P.R. 775, 782 (1983).

 Como veremos más adelante, igual razonamiento tuvo la Asamblea Legis-lativa al enmendar el Art. 1277 del Código Civil, 31 L.P.R.A sec. 3561, y conservar la última oración de la disposición mencionada en lo referente al estatuto real. Véase la Ley Núm. 4 de 5 de marzo de 1987.

 Al determinar en Toppel v. Toppel, supra, pág. 796, que el estatuto real no se activaba ante controversias en el régimen de los bienes matrimoniales, se dispuso que ello tenía la consecuencia de afectar
"... el resultado o, a veces, el razonamiento tan sólo de algunas decisiones nuestras. Quedan afectadas especialmente las de Babilonia v. Registrador, 62 D.P.R. 688 (1943); Fenning v. Tribunal Superior, 96 D.P.R. 615 (1968); y Pueblo v. Denis Rivera, 98 D.P.R. 704 (1970). Se les revoca en cuanto sean incompatibles con esta opinión.”
Ahora bien, en vista de que mediante la opinión de autos se afecta el razona-miento de Toppel v. Toppel, supra, en lo relativo al alcance del Art. 10 del Código Civil, supra, dejamos sin efecto la revocación parcial de la jurisprudencia mencio-nada en Toppel v. Toppel, supra. Ello es similar a lo realizado por nuestra Legisla-tura, la cual —como se explica en la parte VI de esta opinión— enmendó el Art. 1277 del Código Civil, 31 L.P.R.A. see. 3561, devolviéndole al Art. 10, supra, su vigencia en la zona del régimen de bienes matrimoniales.

 Zarelli v. Registrador, supra, pág. 550.

 Commissioner of Internal Revenue v. Skaggs, 122 F.2d 721, 723 (5to Cir. 1941), cert. denegado, Skaggs v. Commissioner of Internal Revenue, 315 U.S. 811 (1942).

 Restatement of the Law, supra, Vol. 1, Sec. 189.

 Art. 1277 del Código Civil, supra.

 Este concepto constituye la norma de conflicto de leyes aplicable en contro-versias surgidas en la zona de bienes gananciales ante cambios en el domicilio con-yugal o del centro de intereses del matrimonio.

 Art. 1277 del Código Civil, supra.

 Toppel v. Toppel, supra, pág. 782.

 Serrano Geyls, op. cit, págs. 510-511.

 Exposición de Motivos de la Ley Núm. 4 de 5 de marzo de 1987 (1987 Leyes de Puerto Rico 13).

 Vda. de Ruiz v. Registrador, 93 D.P.R. 914, 921 (1967).

 Vda. de Ruiz v. Registrador, supra, pág. 925.

 Art. 11 del Código Civil, supra.

 Bracons v. Registrador de San Juan, supra, pág. 757, citando el Informe de la Comisión Codificadora del Código Civil de 1902, presentado a la Asamblea Legis-lativa de Puerto Rico el 31 de diciembre de 1901.

 Restatement of the Law, supra, Vol. 1, Sec. 10.

 Pueblo v. Martinez, 167 D.P.R. 741, 759 (2006).

 Véanse: Pacific Employers Ins. Co. v. Industrial Accident Comm’n, 306 U.S. 493 (1939); Bond v. Hume, 234 U.S. 15 (1917).

 Serrano Geyls, op. cit., pág. 317.

 Art. 1277 del Código Civil, supra. Mediante esta disposición estatutaria, la Legislatura también alteró el concepto de unicidad patrimonial, pues al reiterar la aplicación del estatuto real para resolver cuestiones en la zona del régimen econó-mico matrimonial, le otorgó primacía a la norma de que los bienes inmuebles se rigen según las leyes del lugar en que estén sitos, al margen del régimen patrimonial establecido por los consortes.

 Véase Marín López, op. cit., pág. 539.

 Véase Babilonia v. Registrador, supra, págs. 692-693.

 Recuérdese que por un lado el señor Roselló Puig alegó que si bien la pro-piedad fue transferida a la señora Rodríguez Cruz durante la vigencia del matrimo-nio, él continuó realizando los pagos del préstamo hipotecario del inmueble hasta agosto de 2003 (posterior a decretado el divorcio), fecha en que la señora Rodríguez Cruz lo vendió. Por su parte, la señora Rodríguez Cruz adujo que “[l]as mensualida-des de la hipoteca fueron satisfechas con bienes de la Sociedad Legal de Gananciales desde que la misma fue incurrida hasta aproximadamente el mes de agosto de 2003”. Apéndice de la Petición de certiorari, pág. 80.